642 F.2d 1215
 206 U.S.App.D.C. 247
 BETHLEHEM STEEL CORPORATION, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
Indiana Port Commission and Lake Carriers' Association, Intervenors.
NATIONAL STEEL CORPORATION, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents.
 Nos. 79-1250, 79-1262.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 15, 1980.
Decided June 6, 1980.
Rehearing Denied Aug. 1, 1980.
 
 Max O. Truitt, Jr., Washington, D. C., with whom Judith Barry Wish, Joan S. Powers, Paul V. Miller, and Eugene T. Liipfert, Washington, D. C., were on the brief, for petitioners.
 Clare R. Donelan, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, and John J. Powers and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 Timothy J. May, Washington, D. C., with whom Richard A. Earle, Washington, D. C., was on the brief, for intervenor Indiana Port Commission.
 Scott H. Elder, Cleveland, Ohio, entered an appearance for intervenor Lake Carriers' Association.
 Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and WILKEY, Circuit Judge.
 Dissenting opinion filed by Senior Circuit Judge BAZELON.
 JUDGMENT
 PER CURIAM.
 
 
 1
 These causes came on to be heard on petitions for review of an order of the Federal Maritime Commission and were argued by counsel. While the issues presented occasion no need for an opinion, they have been accorded full consideration by the court. See Local Rule 13(c).
 
 
 2
 The Commission's Report and Order dated January 8, 1979 held that the Harbor Service Charge levied by the Indiana Port Commission on all commercial vessels entering Burns Waterway Harbor was not a regulation or practice related to or connected with the receiving, handling, storing, or delivering of property and was, therefore, not subject to Section 17 of the Shipping Act of 1916. We agree. Thus the Commission's Report and Order directing the Indiana Port Commission to delete the Harbor Service Charge from its terminal tariff is not infected with reversible legal error.
 
 
 3
 On consideration of the foregoing, it is ORDERED and ADJUDGED by this court that the order of the Federal Maritime Commission sought to be reviewed herein is hereby affirmed.
 
 BAZELON, Senior Circuit Judge, dissenting:
 
 4
 The court today holds that a "Harbor Service Charge" levied on commercial vessels entering a harbor to load and unload cargo is not "related to or connected with the receiving, handling, storing or delivery of property" within the meaning of section 17 of the Shipping Act.[1] Because I find this holding contrary to the Shipping Act, the plain terms of the charge, and this court's prior remand opinion, I dissent.
 
 I. BACKGROUND
 
 5
 The present appeal is the latest chapter in litigation now spanning ten years, wherein petitioners Bethlehem Steel Corporation and National Steel Corporation, Midwest Division (hereafter jointly referred to as "Bethlehem") challenge the legality of a "Harbor Service Charge" imposed on them by respondent/intervenor Indiana Port Commission ("The Port"). Petitioners allege that the charge is unreasonable under section 17 of the Shipping Act because it is not reasonably related to any services performed or benefits conferred on them by the Port. They have pursued this claim before the Federal Maritime Commission ("the Commission") since 1971.[2]
 
 
 6
 The Commission agreed with petitioners in 1974 when it unanimously held that the charge was an unreasonable practice violative of section 17.[3] When that decision was appealed to this court, the Commission again argued that the charge was unreasonable under the statute.[4] We reversed and remanded, however, on the ground that the Commission had not developed an adequate factual record in support of its decision.[5] On remand, an administrative law judge once again found that the Harbor Service Charge was unreasonable under section 17.[6] But during these proceedings, the Commission's Bureau of Hearing Counsel, for the first time and sua sponte raised the question of whether the charge was even covered by section 17. Hearing Counsel contended that the charge related solely to a harbor in its navigational sense as a "container of water," and therefore was not "related to or connected with" the wharfing activities listed in section 17. On review of the ALJ's decision, the Commission agreed and dismissed petitioners' complaint for lack of jurisdiction.[7] Thus while the Commission has never doubted that the charge imposed on Bethlehem is grossly unreasonable,[8] it now claims that it is powerless to remedy this inequity.
 
 II. THE MERITS
 
 7
 The Commission's decision neglects the plain terms of the tariff establishing the Harbor Service Charge[9] and impermissibly narrows its own broad responsibilities under the Shipping Act. Whether viewed in terms of its scope, purpose or practical effect, the tariff clearly is subject to section 17.A. Scope
 
 
 8
 The Commission's contention that the charge is "unrelated to the handling of cargo"[10] is inconsistent with the tariff's focus on those vessels which enter Burns Harbor to transfer cargo ashore. While the tariff nominally applies to all commercial vessels entering the harbor, the Port has exempted: (a) vessels entering solely for fuel or to change pilots, (b) vessels remaining in the harbor for less than twelve hours and not receiving or discharging cargo, (c) government vessels not engaged in carrying cargo, and (d) vessels using the harbor as a port of refuge. By so limiting the reach of the tariff to a select group of primarily commercial vessels, the Port has made it virtually certain that the charge will be levied solely on vessels taking on or unloading cargo in the language of section 17, vessels involved in the "receiving" and "delivery" of cargo.
 
 B. Purpose
 
 9
 Similarly, the Commission's contention that the tariff's purpose is merely "to recover (the Port's) capital investment" in the container for the harbor's "body of water"[11] contravenes the plain language of the tariff. The tariff unequivocally states that the charge is intended to defray "the expense of the administration and operation of the Port," including preventing and extinguishing fires "on wharves and other facilities and equipment," and policing "dock areas." The monies collected under the charge thus go toward financing on-shore terminal operations and the day-to-day expenditures necessary to operate the harbor as well as the expenses incurred by the Port in building the waterway.[12] Indeed, recoupment of capital expenditures in the harbor is not even mentioned in the tariff. The Commission has pointed to no evidence in the record to suggest that paying for the construction of the navigational harbor is the sole purpose for the charge, yet it was on that assumption that it abandoned jurisdiction over the fee.[13]
 
 C. Practical Effect
 
 10
 Further, contrary to this court's instruction, the Commission's decision disregards the practical effect which the charge has on the delivery and receipt of cargo at Burns Harbor. This court has stated before that in assessing jurisdiction under section 17 it is practical economic effects, not wooden labels, that must be determinative.[14] Yet here, despite the charge's obvious effects on cargo movement between ship and shore, the Commission has artificially chosen to describe the Port's charge as "an entrance fee to a Federal waterway" in order to relinquish jurisdiction.[15] This change in nomenclature cannot alter the facts that the charge is still assessed primarily on those vessels carrying cargo to or from the harbor; that the charge is still based on a vessels' capacity to carry cargo;[16] and that the money collected under the charge still goes toward sustaining terminal activities.[17] In terms of practical effect, the charge is virtually indistinguishable from a fee imposed directly on dockside activities.
 
 D. Congressional Intent
 
 11
 The Commission's decision is also at odds with Congress' intent in enacting the Shipping Act. As described by a principal sponsor, the Act was intended to be a comprehensive scheme regulating water transportation, particularly as it affects shippers.[18] Accordingly, the Federal Maritime Commission has been granted "complete power and authority to prevent abuses (in the shipping industry), and to enforce regulations made by it for the protection of shippers, boat owners, and all concerned."[19] Despite both this broad mandate and this court's own admonition that the Commission's powers under section 17 "are to be read expansively,"[20] the Commission has dismissed petitioners' complaint, leaving them subject to a charge which the Commission has always believed was unreasonable and unjust. The Commission has provided no reasonable basis for concluding that it is powerless to remedy this abuse.
 
 III. THE REMAND OPINION
 
 12
 At bottom, however, the Commission's decision rests not on an independent assessment of the tariff and its relation to section 17, but on a misinterpretation of this court's previous decision. As the Commission itself states in its brief: "Until the decision in Indiana Port Commission v. FMC . . . it was not clearly understood that the Harbor Service Charge, despite its description in the Port's terminal tariff, did not relate to any of the terminal activities of the Port Commission."[21] Thus, the Commission recognizes that the tariff, as written, is covered by section 17. It ruled otherwise only because of a mistaken belief that in Indiana Port Commission v. FMC this court "rewrote" the tariff, placing it beyond the Commission's jurisdiction. I see nothing in our opinion to support that view.
 
 
 13
 The issue in Indiana Port Commission v. FMC was whether the Harbor Service Charge was reasonable under section 17. At the outset, the court stated that this required a determination of whether in amount the charge was "reasonably related, either to an actual service performed for, or a benefit conferred upon, the person being charged."[22] While the parties agreed this was the proper standard for evaluating the charge, the Port argued the Commission erred by striking down the charge as to all vessels without differentiating between two identifiable categories of shippers: those using both the harbor and the Port's terminal facilities; and those, like Bethlehem, which used the harbor but privately owned terminals. The court agreed, finding the Commission's across-the-board approach incompatible with the need to assess the particular benefits or services received by each class of shippers. The court accordingly remanded the case for specified findings of fact[23], but instead, the Commission dismissed Bethlehem's complaint altogether.
 
 
 14
 The Commission's misinterpretation of our opinion stems from its confusion over the court's distinction between the harbor as a "container of water" and as a set of on-shore terminal facilities. The court drew this distinction to emphasize that unlike other vessels using the Port's public terminal facilities as well as the harbor, Bethlehem's vessels could conceivably receive benefits only from the Port's expenditures toward building the "container of water." The Commission relies upon this distinction instead to argue that this court held, as a fact, that the charge was intended solely to recoup expenditures in the "container of water," and thus falls outside section 17.
 
 
 15
 It should be apparent that the Commission has taken our use of the phrase "container of water" out of context. As described above, the plain language of the tariff states that the charge is intended to defray "the expense of the administration and operation of the Port," a unit consisting of both the "container of water" and the terminal facilities. In our decision we all but expressly recognized this when we restated the Port's principal argument in support of the charge:
 
 
 16
 (T)he Port Commission asserts that it confers benefits upon every vessel entering the Harbor, first, by virtue of its unreimbursed expenditures for the construction of the harbor and public terminal facilities in the amount of $10 million and, second, its continuing expenditures to operate the public terminal.[24]
 
 
 17
 In any event, it was not within the province of this court to modify the terms of the tariff[25] that is a power allocated to the Commission under the Shipping Act.[26] This court's use of the phrase "container of water" therefore was not a ruling on the terms of the tariff, but rather was meant as guidance for the Commission in assessing the tariff's legality under section 17. The Commission's misreading of our opinion should not provide a basis for constricting the scope of section 17's prohibition of unreasonable shipping practices.
 
 IV. CONCLUSION
 
 18
 I recognize that as a general rule an agency's construction of its enabling statute is entitled to deference.[27] But this general principle of deference is not a license for a court to "abdicate its ultimate responsibility to construe the language employed by Congress."[28] Administrative construction of a statute "is only one input in the interpretational equation".[29] As the Supreme Court has stated, and this court recently reiterated:
 
 
 19
 (t)he weight of such a judgment in a particular case will depend upon the thoroughness evident in (the agency's) consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.[30]
 
 
 20
 I believe the Commission's jurisdictional analysis in this case lacks the necessary power to persuade. It contravenes Congress' expressed intent to grant the Commission "complete power and authority to prevent abuses" in the shipping industry.[31] It conflicts with the Commission's position for five years that the Harbor Service Charge is unreasonable under section 17. And, most importantly, it does not represent the exercise of expertise, but rather misinterpretation of this court's prior opinion.[32] In these circumstances principles of deference can have no application. Because the Commission has given no defensible basis for abandoning its responsibility over the contested charges, I would vacate its decision and remand for further proceedings to determine whether the charges imposed upon the petitioners are prohibited by section 17.
 
 
 
 [1]
 46 U.S.C. § 816 (1976). Section 17 provides, inter alia :
 Every . . . carrier and every other person subject to this chapter shall establish, observe and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing or delivery of property. Whenever the Commission finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.
 
 
 [2]
 Bethlehem's complaint was filed with the Commission on August 6, 1971 (Docket No. 71-76)
 
 
 [3]
 Bethlehem Steel Corporation v. Indiana Port Commission, No. 71-76 (FMC March 4, 1974), Joint Appendix ("J.A.") at 15
 
 
 [4]
 Indiana Port Commission v. FMC, 521 F.2d 281 (D.C.Cir.1975)
 
 
 [5]
 Id. at 286-88
 
 
 [6]
 Bethlehem Steel Corporation v. Indiana Port Commission, No. 71-76 (FMC March 14, 1977), J.A. at 171
 
 
 [7]
 Bethlehem Steel Corporation v. Indiana Port Commission, No. 71-76 (FMC January 8, 1979), J.A. at 211
 
 
 [8]
 The ALJ who last considered the charge, for example, found that "the services rendered by the Port to users of the Harbor generally (are) minimal almost non-existent," J.A. 200-01 (emphasis added), and that the Port's contribution to the construction of the harbor "was primarily for (its) own benefit." J.A. 186-87. Instead of striking down the charge, however, the Commission has now given the Port carte blanche to charge what it pleases
 
 
 [9]
 The complete text of the tariff is as follows:
 HARBOR SERVICE CHARGE
 All commercial vessels entering the physical limits of the Port of Indiana Burns Waterway Harbor engaged in import, export, and/or lake traffic shall be assessed a Harbor Service Charge to assist in defraying the expense of the administration/and maintenance of the Port, with the view of preventing collisions and fires, policing the harbor and dock areas, aiding in the extinguishing of fires in vessels and their cargoes, on wharves and other facilities and equipment.
 HARBOR SERVICE CHARGE PER VESSEL
 SIZE CHARGE
 In Gross Per Gross Registered
 Registered Tons Ton or Vessel
Vessels under 100 Gross
Registered Tons $2.50 per vessel per entry
Vessels of 100 Gross
Registered Tons and
Under 500 Gross Registered
Tons $5.00 per vessel per entry
Vessels of 500 Gross $0.01 per Gross Registered
Registered Tons or Over Ton
 Gross registered tonnage of a vessel will be as shown in Lloyd's Register of Shipping or as shown on vessel's register; however, the COMMISSION reserves the right to admeasure any vessel when deemed necessary, and use such measurements as the basis of the Harbor Service Charge.
 Every vessel by its master agent or owner shall pay to the INDIANA PORT COMMISSION the amount due for the Harbor Service Charge upon presentation of an invoice by the COMMISSION.
 The Harbor Service Charge applies to all commercial vessels entering the physical limits of the Port of Indiana Burns Waterway Harbor engaged in import, export, and/or lake traffic, with specific exceptions as noted below:
 a. Vessels calling at the harbor for the sole purpose of receiving bunker fuel and/or ship supplies or changing pilots, and remaining less than twenty-four hours in the harbor.
 b. Vessels passing through the harbor and remaining less than twelve hours and not receiving or discharging cargo.
 c. Government vessels not engaged in carrying cargo, troops or supplies.
 d. Vessels using the harbor as a harbor of refuge.
 If any of the services enumerated above should be rendered by this COMMISSION to a vessel which has not paid the Harbor Service Charge, or to a vessel which is exempt from the payment of the Harbor Service Charge for the protection of bulkheads, piers, wharves, buildings, appurtenances, or other property of third persons, such service (including the cost of labor and materials used) shall be charged to the vessel receiving such services, or charged to the lessee of such bulkheads, piers, wharves, buildings, appurtenances, or other property, in accordance with prices fixed by this COMMISSION. Nothing herein contained, however, shall be construed as obligating this COMMISSION to render such services, or as making it liable for the failure or refusal to render such services.
 
 
 [10]
 Brief for Respondents FMC at 15
 
 
 [11]
 Id. at 15, 36-37
 
 
 [12]
 This is made clear by the tariff's system of separate assessments for those ships which use the Port's services but do not pay the Harbor service charge. See note 9 supra
 
 
 [13]
 See Bethlehem Steel Corporation v. Indiana Port Commission, No. 71-76 (FMC January 8, 1979), J.A. 211, at 220
 
 
 [14]
 See American Export-Isbrandtsen Lines, Inc. v. FMC, 389 F.2d 962 (D.C.Cir.1968). There we held that under section 17 the Commission was empowered to require a terminal operator to compensate truckers for unusual truck delays caused by inefficient terminal management. The Commission justified the rule as an incentive to speed up truck loading time, thus increasing the overall efficiency of terminal operations and, in turn, lowering costs to shippers at the terminal. See id. at 967-68. We reject the terminal operator's suggestion that the Commission lacked jurisdiction to order compensation because the practice involved "transportation" rather than any of the activities listed in section 17. Focusing on the economic relationship between efficient terminal management and lower costs to shippers, we held the practice "obviously" effects the "delivery" of property. Id. at 968
 
 
 [15]
 Brief for Respondents FMC at 44
 
 
 [16]
 See note 9 supra. The rate assessed a vessel is determined by the gross registered tonnage of the vessel, a method which effectively taxes a ship proportionate to its ability to carry cargo
 
 
 [17]
 See page 1218 & n.12
 
 
 [18]
 53 Cong.Rec. 8095 (1916) (remarks of Rep. Burke)
 
 
 [19]
 53 Cong.Rec. 8096 (1916) (remarks of Rep. Burke)
 
 
 [20]
 Transamerican Trailer Transport, Inc. v. FMC, 492 F.2d 617 (D.C.Cir.1974)
 
 
 [21]
 Brief for Respondents FMC at 30
 
 
 [22]
 Indiana Port Commission v. FMC, 521 F.2d 281, 285 (D.C.Cir.1975)
 
 
 [23]
 On remand, the Commission was to determine:
 1) Precisely which contributions of each of the four parties contribute benefits to vessels using the Harbor itself;
 2) How much each of these contributions are worth to these vessels using the Harbor;
 3) In light of 1) and 2), is the Harbor Service Charge contained in the Port Commission's Tariff just and reasonable with regard (a) to vessels using the public terminal and (b) to vessels using Bethlehem's facilities.
 Id. at 287.
 
 
 [24]
 Indiana Port Commission v. FMC, 521 F.2d 281, 285 (D.C.Cir.1975)
 
 
 [25]
 See Bellevue Gardens, Inc. v. Hill, 297 F.2d 185 (D.C.Cir.1961)
 
 
 [26]
 See note 1 supra
 
 
 [27]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). But see Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970): "(W)here the only or principal dispute relates to the meaning of (a) statutory term . . . (the controversy) presents issues on which the court, and not (administrators), are relatively more expert.", quoting Hardin v. Kentucky Utilities Co., 390 U.S. 1, 14, 88 S.Ct. 651, 658, 19 L.Ed.2d 787 (1968) (Harlan, J., dissenting)
 
 
 [28]
 Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969)
 
 
 [29]
 Id. at 192, 90 S.Ct. at 327
 
 
 [30]
 Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), quoted in National Distributing Co., Inc. v. U.S. Treasury Department, 626 F.2d 997 (D.C.Cir. 1980)
 
 
 [31]
 See TAN 1219, supra
 
 
 [32]
 "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)