**INDIANA PORT COMMISSION,**
**Petitioner,**

**v.**

**FEDERAL MARITIME COMMISSION,**
**Respondent,**

Bethlehem Steel Corporation, Waterways Freight Bureau, and Lake Carriers Association, Intervenors.

No. 74–1477.

United States Court of Appeals, District of Columbia Circuit.

Argued 22 April, 1975.

Decided 16 Oct. 1975.

Timothy J. May, Washington, D. C., with whom Richard A. Earle, Wash-

ington, D. C., was on the brief for petitioner.

William H. Smith, Jr., Atty., Federal Maritime Commission with whom James L. Pimper, Gen. Counsel, Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, were on the brief for respondent.

Paul V. Miller, Bethlehem, Pa., with whom Max O. Truitt, Jr., and Douglas G. Thompson, Jr., Washington, D. C., were on the brief for intervenor Bethlehem Steel Corp. Timothy B. Dyk, Washington, D. C., also entered an appearance for intervenor Bethlehem Steel Corp.

Gordon P. MacDougall, Washington, D. C., was on the brief for intervenor Waterways Freight Bureau.

Scott H. Elder, Cleveland, Ohio, was on the brief for intervenor Lake Carriers Assn.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

In this petition for review of an order of the Federal Maritime Commission (FMC), we are asked to consider the lawfulness of a charge levied by the Indiana Port Commission, a public body, at Burns Waterway Harbor, Portage, Indiana. The charge in question is levied against all commercial vessels engaged in import, export, and/or lake traffic entering the physical limits of the Harbor. In its decision dated 4 March 1974 the FMC found that the charge assessed by the Indiana Port Commission is an unreasonable practice relating to or connected with the receiving, handling, storing or delivering of property, and therefore unlawful as a violation of Section 17 of the Shipping Act of 1916.[1] For reasons stated more fully below, we set aside the FMC's order and remand for further determinations.

I. *The Facts*

Petitioner Indiana Port Commission (Port Commission) is an instrumentality of the State of Indiana, created *inter alia* for the purpose of constructing a port and public terminal on the south shore of Lake Michigan near Portage, Indiana. The Port Commission was joined in its efforts to plan and construct the Burns Waterway Harbor By Bethlehem Steel Corporation (Bethlehem) and Midwest Division of National Steel Corporation (Midwest), both of whom already owned land near the proposed harbor site. Bethlehem and Midwest each wanted to construct steel plants on their land and, as a result, needed supporting docking facilities.

In 1962 the Port Commission and Bethlehem entered into an "Agreement between the Indiana Port Commission, the Indiana Department of Conservation and Bethlehem Steel Corporation." The salient provisions provided that the Port Commission: 1) purchase some of Bethlehem's land; 2) grant Bethlehem riparian rights to extend its land holding out into the Lake; 3) waive in perpetuity its right to condemn Bethlehem's land; and 4) allow Bethlehem's vessels access to and across the waters of the outer harbor under the same terms and conditions extended to all other vessels using the Harbor. In return, Bethlehem undertook *inter alia* to construct a portion of the harbor entrance and the bulkhead on the east end of the Harbor.[2]

Thereafter, construction of the port and harbor facilities proceeded. Reference is made throughout to the following map of the facility:

---

1. 46 U.S.C. § 816 (1970). *See generally Volkswagenwerk A. G. v. Federal Maritime Commission*, 390 U.S. 261, 278–282, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

2. *Bethlehem Steel Corporation v. Indiana Port Commission*, Docket No. 71–76 (4 March 1974), Appendix p. 6.

CORPS OF ENGINEERS U.S. ARMY

LOCATION MAP
SCALE OF FEET
4000 0 4000

NORTH BREAKWATER
SECTION AT A
SCALE OF FEET
40 0 40

VICINITY MAP
SCALE OF MILES

PROJECT DEPTHS AND SOUNDINGS ARE REFERRED TO LOW WATER DATUM 576.8 FEET ABOVE MEAN WATER LEVEL AT FATHER POINT, QUEBEC IGLD (1955) (INTERNATIONAL GREAT LAKES DATUM)

BURNS WATERWAY HARBOR
INDIANA

IN 1 SHEET          SHEET NO 1
SCALE OF FEET
600   0   600   1200

CORPS OF ENGINEERS          CHICAGO, ILL

30 JUNE 1973

As noted, Bethlehem constructed part of the harbor entrance and the entire bulkhead on the east end of the Harbor. Midwest constructed the bulkhead which comprises the west end of the Harbor. The cost of neither of these projects was found by the Administrative Law Judge or the Maritime Commission.

The Port Commission constructed the breakwater which forms the northern boundary of the Harbor, a central pier area, and the bulkhead and rubble-mound which forms the southern boundary of the Harbor. In addition, it provided the land which forms the floor of the Harbor and the breakwater, set aside a spoils disposal area for future maintenance dredging of the Harbor, and paid for the dredging of the Harbor. As regards the public terminal facilities, the Port Commission paid for construction of a highway overpass bridge, a sewage disposal plant and distribution system for the collection of sewage and sanitary waste and ships' bilge water, a transit shed, paved areas for storage of goods, an office building, four service and supply vessels with water, electrical power, sewage collection and fire protection.

The cost of all of these improvements to the Port Commission was approximately $23 million.[3] Of this amount $13 million has been reimbursed the Port Commission by the Federal Government under the authority of the River and Harbor Act of 1965, 79 Stat. 1089.[4] The FMC found that this reimbursement was for construction of the north breakwater and all dredging except for a 100-foot strip immediately adjacent to the Port Commission's pier.[5] Noting that this left unreimbursed items aggregating $10 million in cost, the FMC states that "[t]he record fails to disclose how much of this $10,000,000 is attributable to the cost of constructing the public terminal facilities and its appurtenances and how much of

the $10,000,000 is attributable to the cost of constructing the 'harbor'."[6]

When the port came into operation, the Port Commission began billing all vessels entering the Harbor a Harbor Service Charge. Because Bethlehem regarded the Harbor Service Charge as unlawful, it refused to pay any such billings. Through the end of 1972, a period of two years, outstanding charges relating to barges that docked at Bethlehem's facility were approximately $34,000.[7]

In July 1971 an action was commenced against Bethlehem in Indiana state court to recover outstanding charges. The action was subsequently removed to the United States District Court for the Northern District of Indiana and stayed pursuant to a stipulation and an order pending recourse to the Federal Maritime Commission.[8] After hearings, an Administrative Law Judge issued an initial decision in which he found the Port Commission's charge to be in violation of Section 17 of the Shipping Act. Exceptions were taken and on 4 March 1974 the FMC issued the Report and Order under review. The FMC held that a charge can be reasonable only if it is assessed on the basis of actual service performed or benefit conferred upon the person to be charged. No services were held to be performed except to those vessels using the Port Commission's facilities. The Report proceeded to examine four different benefits allegedly conferred on every vessel entering the Harbor and rejected each as a basis for the Harbor Service Charge. As a result the FMC concluded that the charge was "an unreasonable practice" in violation of the Shipping Act.

A Petition for Review was filed with this court by the Port Commission. The court has jurisdiction to entertain the petition under 28 U.S.C. § 2342(3).

3. *Id.* at 7.

4. *Ibid.*

5. *Id.* at 7–8.

6. *Id.* at 8.

7. *Id.* at 4. *See also* Direct examination of Captain Steven M. Moodie, Appendix p. 21.

8. Bethlehem's complaint was filed with the FMC on 6 August 1971 and was assigned Docket No. 71–76.

## II. *The Merits*

The second paragraph of Section 17 of the Shipping Act provides:

Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Commission finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.

It is conceded by both the parties that the Port Commission is an "other person subject to this chapter" because it furnishes terminal facilities at the Harbor.[9]

▮ The general principles governing the interpretation of this provision are not in dispute. A charge is unreasonable if it is not reasonably related, either to an actual service performed for, or a benefit conferred upon, the person being charged. The Port Commission has never contended that it provided any *services* to the ships docking at Bethlehem's facilities, but on the other hand it has vehemently argued that it has conferred *benefits* upon these vessels and is therefore entitled to impose a reasonable charge. Indeed, the Port Commission asserts that it confers benefits upon every vessel entering the Harbor, first, by virtue of its unreimbursed expenditures for the construction of the harbor and public terminal facilities in the amount of $10 million and, second, its continuing expenditures to operate the public terminal. We find some distinction between the two claims as applied to Bethlehem vessels inasmuch as these vessels use the public harbor but not the public terminal facilities, being always berthed at the Bethlehem terminal.

For clarity it is helpful to bear in mind two distinctions:

1) The distinction between the construction of the Harbor itself, *i. e.,* the container for the water to a navigable depth, in contrast with the construction of the pier facilities, *i. e.,* unloading cranes, warehousing, wharfage facilities on top of the sides of the artificial harbor;

2) The distinction between the benefits which flow to the private companies and the benefits which flow to the public body, the Port Commission, from their respective construction efforts.

With reference to the first distinction, the two private companies obviously contemplated that their investment in both types of construction, the Harbor itself and the unloading facilities on top of the retaining walls of the Harbor, would return to the private companies a profit from operations like other investments made in steel plant facilities. It is only on this basis that Bethlehem and Midwest each would have approved the investment of several million dollars in constructing 1) one of four sides of a harbor facility, and 2) the machinery on top of the dockage area to provide facilities on the eastern and western sides for the two companies.

In contrast, by its contribution to the construction of the Harbor itself and the public warehouse and docking facilities, the Port Commission as a public body contemplated conferring a benefit on 1) all vessels which enter the Harbor, and 2) those vessels which tie up at the public docking facilities. In regard to 2), there is no question that the Port Commission can charge a proper fee for services rendered at dockside. With regard to 1) and investment in the construction of the Harbor itself, the only way the Port Commission, in contrast to the private profit-making steel companies, can hope to get back its investment in the construction of the Harbor is to charge vessels coming into the Harbor for the use of the Harbor itself. The steel companies' investment in the Harbor went to create a harbor which their own vessels will use profitably; the Port Commission has no vessels and therefore must obtain the return on its investment in the Harbor itself by the Harbor Service Charge.

9. 46 U.S.C. § 801 (1970).

At oral argument the attorney for the Federal Maritime Commission agreed that if the Port Commission had paid for all of the construction of the Harbor, then there would be no question about the Port Commission's power to make a harbor service charge for every vessel coming into the Harbor. It is only because the construction cost of this Harbor was split four ways that the FMC now argues that the Port Commission conferred no benefits for which it has not been recompensed, and therefore cannot now make a harbor service charge. If we are to evaluate the argument by the conferring of benefits test, Bethlehem and Midwest have conferred benefits not only on themselves but also on all other vessels coming into the Harbor by each constructing one fourth of the harbor retaining wall and part of the harbor entrance, and are presumably receiving the benefits conferred on themselves from profits made in their private enterprises. In contrast, the only way the Port Commission can obtain an equivalent return from its construction of one fourth of the harbor retaining wall, etc., is to make a charge on vessels using the Harbor, i. e., on whom the Port Commission confers a benefit, proportionate to the Port Commission investment in the Harbor only.

The question here arises whether the two steel companies contemplated paying a service charge to the Port Commission and thus to contribute to the Commission's return on its investment in the Harbor. We are cited to nothing in the contract language between the parties which gives a specific clue to the parties' understanding. Both FMC and Bethlehem simply argue that the whole agreement was on a quid pro quo basis,[10] but the right of the Port Commission to charge Bethlehem and Midwest vessels on exactly the same basis as other vessels entering the Harbor was apparently never considered.

In making an argument limited to denying that any right to charge Bethlehem vessels exists, Bethlehem urged that the Harbor Service Charge must be based on a benefit conferred upon the vessels going to and from Bethlehem's docks. The FMC, however, did more than invalidate the tariff as applied to Bethlehem vessels. The FMC found that the Port Commission had made no contributions to the improvement of navigation for which it had not been fully compensated, that no services were performed by the Port in connection with the Harbor other than those at its terminal facility, that no separate identifiable benefits were otherwise conferred by the Port upon vessels using the Harbor, and therefore the tariff was invalid as to *all* vessels.

This no "separate identifiable benefit" finding of the FMC is hard to reconcile with other conclusions of the FMC; or perhaps more accurately, it is hard to see why the FMC did not attempt to ascertain the separate contributions of the parties. The FMC in its report found that "[a] large portion of the $10,000,000, exactly how much is unclear, went to the construction of the public terminal operated by the Port Commission . . .," and that therefore the revenues to repay these expenditures "ought to come from dockage, wharfage, warehouse fees and the like assessed to vessels, shippers and others using the terminal . . . ."[11] By negative implication the FMC seems to concede that at least *some* of the unreimbursed amounts do *not* relate to the public terminal facilities and *thus may relate to the Harbor generally*. The FMC indicates that "other less tangible items" may have conferred benefits generally on those using the Harbor. Such items include the deed to the Corp of Engineers of the land under the north breakwater, the easements to dredge the Harbor and place the spoils thereof on a twenty acre plot near the Harbor, the

10. Another "quid pro quo" argument is that the Port Commission contributions were made in consideration of certain federal contributions, but again we are not cited to any terms of the contract relevant to this issue on either side.

11. *Bethlehem Steel Corporation v. Indiana Port Commission*, Docket No. 71–76 (4 March 1974), Appendix p. 12.

value of the State's eminent domain powers to the project, and the fact that the State initially made available the funds necessary to construct the Harbor (although these amounts were later reimbursed it by the Federal Government).

The FMC, however, as we noted above, declared that neither the remainder of the $10,000,000 nor the other items could be the basis for a charge because they were "part of a quid pro quo arrangement" between the Port Commission and Bethlehem. According to the FMC, the Port Commission, and the other parties involved, "have received bargained-for consideration in return for their contributions toward creating this new harbor. To allow these contributions by the [Port Commission] to be a basis for the Harbor Service Charge would in effect allow the [Port Commission] to have a double recovery." [12]

■ We disagree with this line of reasoning and therefore must set aside the FMC decision. It is quite clear that the agreement between Bethlehem and the Port Commission concerned both obligations related to and quite unrelated to the planning, construction, or maintenance of the Harbor. That the parties may have believed that each was receiving an equivalence to what it was giving is not directly relevant to assessing the justness and reasonableness of charges imposed on all vessels, including Bethlehem's, using the Harbor. We think it impossible for the FMC to conclude that no identifiable benefits were conferred on Bethlehem or any other vessels by the Port Commission when, in fact, neither party's contribution relative to the Harbor, as separate from terminal facilities, was ever evaluated by the FMC or the Administrative Law Judge.

It is the failure of the FMC to determine precisely the parties' contribution to the construction of the Harbor (and their contract understanding with regard

to same) which necessitates a remand to the FMC. We have before us neither that factual determination nor a consideration of the legality of imposing a Harbor Service Charge on vessels other than those of the two steel companies, or imposing a reduced charge on the companies' vessels after consideration given to the benefits conferred on all vessels by the companies' capital contribution to the construction of the Harbor. As discussed above, the FMC invalidated the tariff as to *all* vessels following its blanket determination that the Port Commission had conferred no benefits on any vessels using the Harbor itself. We leave the determination of the facts and the law applicable thereto in the first instance to the FMC.

Thus, on remand we contemplate that the FMC will make the following determinations:

1) Precisely which contributions of each of the four parties contribute benefits to vessels using the Harbor itself;

2) How much each of these contributions are worth to these vessels using the Harbor;

3) In light of 1) and 2), is the Harbor Service Charge contained in the Port Commission's Tariff just and reasonable with regard (a) to vessels using the public terminal and (b) to vessels using Bethlehem's facilities.

As to the other theories of benefit advanced by the Port Commission, we find no grounds for reversal. The FMC found that "the expenditures incurred by the Port Commission in administering the Harbor as a 'public port' . . ." [13] really involve nothing more than expenditures relative to the operation of the public terminal facilities. Therefore, it reasonably concluded that such expenditures provided no benefit to vessels using just the Harbor. In addition, the FMC found that the "capability and authority of the Indiana Port Commission to regulate the movement of vessels into and within the Harbor . . ." [14] was an as yet unexercised authority and ca-

---

**12.**  *Id.* at 14.

**13.**  *Ibid.*

**14.**  *Id.* at 15–16.

pability. Thus, it provided no basis for a Harbor Service Charge on vessels using Bethlehem's facilities.

The only theory of benefit advanced by the Port Commission, which must be considered on remand, is based upon benefits accruing from the previously discussed capital expenditures relative to the Harbor.

The Order of the Federal Maritime Commission is set aside and the case remanded for further proceedings in accordance with this opinion.

*So ordered.*