INDIANA PORT COMMISSION,
Plaintiff,

v.

BETHLEHEM STEEL CORPORATION,
Defendant.

INDIANA PORT COMMISSION,
Plaintiff,

v.

NATIONAL STEEL CORPORATION,
Defendant.

INDIANA PORT COMMISSION,

v.

LAKE CARRIERS ASSOCIATION,
Intervenor.

Nos. 71 H 228, H 80–680.

United States District Court,
N. D. Indiana,
Hammond Division.

April 14, 1981.

Lindley E. Pearson, Atty. Gen. of Indiana, Indianapolis, Ind., Patton, Boggs & Blow, Washington, D. C., Galvin, Galvin & Leeney, Hammond, Ind., for plaintiff.

J. M. O'Malley, Bethlehem, Pa., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., Beckman, Kelly & Smith, Hammond, Ind., Douglas, Douglas & Douglas, Valparaiso, Ind., Scott H. Elder, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

There are cross motions for summary judgment pending on the issues of liability in this case which the Court now takes up.

### I.

Plaintiff Indiana Port Commission was created by the General Assembly of the State of Indiana in 1961, ch. 11, § 1, p. 14; Indiana Revised Statutes § 8–10–1–1 *et seq.* Its purpose is to "promote the agricultural, industrial and commercial development of the state, and to provide for the general welfare" by the construction and operation of port facilities, and in particular, "of a modern port on Lake Michigan." *Id.* Plaintiff has been described as "a public corporate entity separate from the state as a sovereign entity," or, in other words, "an instrumentality or agency of the state although it is not the state in its sovereign corporate capacity." *Orbison v. Welsh*, 242 Ind. 385, 179 N.E.2d 727, 734 (1962).

In carrying out its legislative mandate, the Commission determined to plan and construct a port and public terminal, called Burns Waterway Harbor, on Lake Michigan near Portage, Indiana. The Commission agreed with Defendants, Bethlehem Steel Corporation ("Bethlehem") and the Midwest Division of National Steel Corporation ("National"), in 1962, to construct the new facilities adjacent to parcels of land already owned by Bethlehem and National.

According to the terms of the 1962 agreement, the Commission (1) purchased some land from Bethlehem; (2) granted Bethlehem riparian rights in the Lake; (3) waived in its perpetuity its right to condemn Bethlehem's land; and (4) agreed to allow Bethlehem's vessels "access to and across the waters of the outer harbor under the same terms and conditions extended to all other vessels and under the same regulations governing all other vessels making use of Burns Waterway Harbor." Exhibit B hereto, ¶ 10. In exchange for this, Bethlehem agreed *inter alia* to construct part of the Harbor entrance, as well as the bulkhead at the east end (*i.e.* the Bethlehem side) of the Harbor, the east deflector wall, and riparian enclosure walls. National undertook to build the bulkhead on its property (the west end).

The Commission paid for all other construction involved in the creation of the Harbor. In addition, it contributed the land under the Harbor itself and under the breakwaters, 20 acres of land for disposal of future dredge spoils, and the cost of dredging the Harbor. The Commission also built a public port facility on the land to which it had title, *i.e.*, the central portion of the site.

Lands contributed by IPC had been purchased with an appropriation of $2 million by the Indiana General Assembly in 1957. In the years 1965 through 1967, the General Assembly appropriated another $25.5 million to the construction of Burns Waterway Harbor. It appears that approximately $23 million of this was actually spent by the Commission on the Harbor project.

Pursuant to the River and Harbor Act of 1965, Pub.L. 89–298, the United States Government through the Army Corps of Engineers agreed to reimburse the Commission part of these expenditures. Over a period beginning in April 1970 and ending in October 1975, the Corps remitted to IPC a total of $13,364,266.12. Thus some $9.6 million, approximately was not returned to the Commission. Some of this money was attributable to the construction of the public port facilities, and the remainder was part of the costs of the Harbor itself. Bethlehem and National, of course, also had unreimbursed costs connected with the portion of Harbor construction undertaken by them.

Burns Waterway Harbor came into operation in 1970. The tariff then published by the Commission, setting fees payable by users of the Harbor and of the public terminal facilities, included an item styled the "Harbor Service Charge" ("HSC"). HSC was assessed upon "[a]ll commercial vessels entering the physical limits" of the Harbor. Its purpose was stated to be

to assist in defraying the expense of the administration and maintenance of the Port and Harbor, including the supervision of the shipping of the Port, with the view of preventing collisions and fires, policing the harbor and dock areas, aiding in the extinguishing of fires in vessels and their cargoes, on wharves and in other facilities and equipment.

The HSC was assessed on all vessels, according to their gross registered tonnage, including those owned by Bethlehem and National and those calling at the docks owned by Defendants.

The tariff provided further that

[e]very vessel by its master, agent or owner shall pay to the [IPC] the amount due for the Harbor Service Charge upon presentation of an invoice by the [Commission].

Four categories of vessels were made exempt from the HSC:

a) Vessels calling at the Harbor for the sole purpose of receiving bunker fuel and/or ship supplies or changing pilots, and remaining less than twenty-four hours in the Harbor;

b) Vessels passing through the Harbor and remaining less than twelve hours and not receiving or discharging cargo;

c) Government vessels not engaged in carrying cargo, troops or supplies; and

d) Vessels using the harbor as a harbor of refuge.

The Commission reserved the right to charge such exempt vessels for any services actually rendered to them.

Pursuant to this tariff, the Commission began to bill National and Bethlehem, as well as users of the public port, for HSC payable on all vessels calling at their facilities. Some of these vessels were owned and/or operated by Defendants, and some, presumably, were not.

From the outset, Bethlehem and National refused to pay the HSC. As of the end of 1980, these unpaid charges amounted to approximately $200,000 in the case of Bethlehem.

In July 1971 Plaintiff began a debt collection action against Bethlehem in an Indiana State Court. The action was removed to this Court on Defendant's motion later in 1971.

At the same time, Bethlehem mounted a challenge to the HSC before the Federal Maritime Commission ("FMC"). The FMC has jurisdiction over certain aspects of the carriage of goods in interstate commerce, and in particular, is charged with the administration of § 17 of the Shipping Act of 1916, 46 U.S.C. § 816, which reads in pertinent part:

Every ... carrier and other person subject to this chapter shall establish, observe and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing or delivery of property.

The FMC is granted the authority to "determine, prescribe, and order enforced a just and reasonable regulation or practice" whenever it finds that this provision is not being observed. *Id.*

Hearings were held and testimony taken by the FMC on the question whether the HSC violated § 17, and the FMC's Administrative Law Judge struck down the charge. The Commission took exception to that ruling, and on March 4, 1974, the FMC issued its Report and Order.

The Federal Maritime Commission upheld the Administrative Law Judge's opinion. It ruled that a charge is "reasonable" within § 17 only if it is reasonably related to a service performed for, or a benefit conferred upon, the person against whom it is assessed. The FMC concluded that the Commission neither performed services for nor conferred benefits upon vessels using the Harbor but not the public terminal.

IPC appealed this determination to the United States Court of Appeals for the District of Columbia Circuit, pursuant to 28 U.S.C. § 2342(3). The Court of Appeals reversed, on October 16, 1975, and remanded the proceedings to the FMC for further consideration. *Indiana Port Commission v. Federal Maritime Commission*, 521 F.2d 281 (D.C.Cir.1975).

The Court of Appeals found that while no "service" performed by IPC was sufficient to justify the HSC under the Shipping Act, it was unable to reach such a conclusion with respect to "benefits." IPC, the Court held, could be said to confer cognizable benefits by its very investment in the Harbor itself. The Court stated that

> [t]he steel companies' investment in the Harbor went to create a harbor which their own vessels will use profitably; the Port Commission has no vessels and *therefore must obtain the return on its*

> *investment in the Harbor itself by the Harbor Service Charge.*

521 F.2d at 285, (emphasis added).

While the FMC below had apparently conceded that at least some of IPC's unreimbursed expenses "do *not* relate to the public terminal facilities and *thus may* relate to the Harbor generally," 521 F.2d at 286, emphasis in original, it had made no attempt to quantify those disbursements. Rather, the FMC had held that neither the $10 million not reimbursed by the Corps, nor the other contributions by the Commission to the Harbor (such as land, the waiver of eminent domain, and the provision of the entire construction cost pending Federal reimbursement), could substantiate the charge "because they were 'part of a quid pro quo arrangement' between the Port Commission and Bethlehem." 521 F.2d at 287.

The Court stated that it "disagree[d] with this line of reasoning," and therefore set aside the FMC decision. 521 F.2d at 287. It found that an identifiable benefit, as required by § 17 of the Shipping Act, *could* be constituted by initial investment in construction of the Harbor, depending upon the parties' original contributions to the Harbor itself ("the Harbor as a container of water"), as opposed to the terminal facilities. Since the FMC had reached no conclusion with respect to this point, the Court remanded the case with directions that three questions be addressed:

1) What contributions of the four parties (IPC, Bethlehem, National, and the Corps of Engineers) generate benefits for all vessels using the Harbor?

2) How much are those contributions worth to vessels using the Harbor? and

3) In light of (1) and (2), is the HSC reasonable (a) as to vessels using the public facilities; and (b) as to vessels using Bethlehem's facilities?

Shortly after the FMC decision was rendered, the Commission had suspended collection of the HSC. The Commission reinstated HSC to its tariff on May 21, 1976.

On remand, the Administrative Law Judge took evidence on the questions posed by the Court of Appeals. His answers, which are set out in excerpts from his opinion at Exhibit E hereto, were as follows:

1) a) The Corps of Engineers contributed $13,364,266.12, which amount was reimbursement to the Commission;

b) The Indiana Port Commission contributed unreimbursed sums amounting to $5,774,462 *for the benefit of all users* (*i.e.*, for the Harbor, not the public terminal);

c) National's cost of construction was $5,021,654; and

d) Bethlehem contributed $11,130,299 to construction, $10.2 million of which went to construction of the dock wall.

2) The benefit conferred upon users of the Harbor generally is proportionate to the costs of construction borne by each of the parties.

3) Therefore the HSC is not a reasonable charge within § 17 of the Shipping Act.

This decision was rendered on March 11, 1977. Once again, exception was taken to the FMC. Before the Administrative Law Judge, however, the FMC's hearing counsel had raised the argument that the HSC did not come within § 17 at all, since it was not "relating to or connected with the receiving, handling, storing or delivery of property." Counsel argued that insofar as the Court of Appeals had required analysis of contributions to the Harbor *as a container of water*, as opposed to terminal facilities for the loading and unloading of cargo, the result was to exclude from the former any consideration that might implicate § 17.

The FMC agreed, and on January 9, 1979, dismissed the proceeding for lack of jurisdiction. Bethlehem and National appealed to the United States Court of Appeals for the District of Columbia Circuit. On June 6, 1980, the Court of Appeals affirmed *per curiam*, in an unpublished judgment. No petition for *certiorari* was filed.

Plaintiff filed an Amended Complaint in this Action in the United States District Court for the Northern District of Indiana on October 24, 1980, and Bethlehem filed an Amended Answer on November 12. The Amended Complaint was substantially identical to the Complaint filed over nine years earlier but for the amount of damages claimed; the Amended Answer was substantially identical to the original Answer but for elimination of the Shipping Act defense. Defendant-Intervenor Lake Carriers' Association too filed an Answer to the Amended Complaint. On November 26, 1980, Plaintiff filed its complaint against Defendant National, and moved to consolidate the two cases on January 16, 1981.

The Indiana Port Commission continues to levy a Harbor Service Charge upon all vessels entering the Burns Waterway Harbor, with the same categories of exceptions as noted.

IPC relies upon a system of visual inspections to determine what vessels are in the Harbor at any given time. A daily log is kept, and Lloyds Register is consulted to ascertain the gross registered tonnage of each vessel. The Commission sends invoices for the HSC payable on each vessel to the owner or tenant of the terminal facilities at which the vessel has called.

At present, nine tenants occupy public port facilities. All of them are liable for payment of HSC on vessels calling at their docks.

The Indiana Port Commission provides and has provided benefits upon all uses of Burns Waterway Harbor, by virtue of its initial investment in construction (which, unlike the investments of Defendants, cannot be recovered out of profits), and by its acting as liaison or spokesman for the Harbor with Federal and State Government agencies. IPC also remains liable for maintaining the rubble mound retaining wall, for setting aside land available for dredge spoils disposal, and for holding the Federal Government harmless for damage arising from shore erosion or littoral drift. All of these are benefits enjoyed by all users of the Harbor.

Since 1970, neither Defendants Bethlehem or National has paid any amount to-

ward HSC assessed on vessels calling at their docks.

## II.

### A.

The Constitution of the United States reserves to Congress the power "(t)o regulate Commerce with foreign Nations, and among the several States." Article I, § 8, cl. 3. It is beyond challenge that this congressional authority over interstate commerce is to be read broadly, both as to what constitutes "commerce," *Gibbons v. Ogden*, 9 Wheat. (22 U.S.) 1, 6 L.Ed. 23 (1824), and as to when such commerce is interstate in character. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

■ Nevertheless, the Constitution does not deprive the States of authority to impose reasonable, non-discriminatory regulations upon trade. In the exercise of their police power, for example, the States "may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960).

■ A large proportion of the shipping liable for Harbor Service Charge is shipping in interstate or foreign commerce. This fact alone does not invalidate a State charge. Here, the State of Indiana at its own expense has provided an improvement, and the Supreme Court of the United States has many times held that the Constitution does not forbid the States "to demand from those engaged in commerce just compensation for the use of . . . artificial facilities, provided and maintained at its expense." *Northwestern Union Packet Company v. City of St. Louis*, 10 Otto. (100 U.S.) 423, 25 L.Ed. 688 (1880); *see also Cannon v. New Orleans*, 20 Wall. (87 U.S.) 577, 22 L.Ed. 417 (1874); *Keokuk Northern Line Packet Co. v. Keokuk*, 5 Otto. (95 U.S.) 80, 24 L.Ed. 377 (1877).

The HSC is assessed upon all vessels, with certain specific exceptions, and in no way discriminates as between vessels engaged in interstate (or foreign) and intrastate trade. It is not a tax levied upon those who engage in commerce, but a charge through which the State seeks to recover its investment in the facility used by those required to pay it.

This case is thus similar to *Huse v. Glover*, 119 U.S. 543, 7 S.Ct. 313, 30 L.Ed. 487 (1886). There, the State of Illinois improved a section of the Illinois River, with some portion of the expenditures borne by the United States. A charge was levied for use of the locks and dams thus constructed. The Supreme Court of the United States upheld the charge against the complaint that it was an unconstitutional interference with interstate commerce. The Court stated:

> The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream . . . . For outlays caused by such works the State may exact reasonable tolls.

119 U.S. at 548, 7 S.Ct. at 315, 30 L.Ed. at 490.

*Huse* was expressly approved by the Supreme Court in *Sands v. Manistee River Improvement Co.*, 123 U.S. 288, 8 S.Ct. 113, 31 L.Ed. 149 (1887) ("to meet the cost of such improvements, the States may levy a general tax or lay *a toll upon all who use the rivers and harbors as improved*," 123 U.S. at 293, 8 S.Ct. at 115, 31 L.Ed. at 151, emphasis added), and in *Monongahela Navigation Company v. United States*, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893).

The refusal by Defendants to pay the legally authorized HSC herein, insofar as it may be based upon allegations of unconstitutionality, is defeated by the *Huse* case and its progeny. "[C]harges levied by state authority to defray the cost . . . of facilities in aid of interstate or foreign commerce have consistently been held to be permissible." *Clyde Mallory Lines v. Alabama*, 296 U.S. 261, 267, 56 S.Ct. 194, 196, 80 L.Ed. 215 (1935). *See also Packet Co. v. Keokuk, supra; Transportation Company v. Parkers-*

*burg,* 107 U.S. 691, 2 S.Ct. 732, 27 L.Ed. 584 (1882); *Morgan's Steamship Company v. Louisiana Board of Health,* 118 U.S. 455, 6 S.Ct. 1114, 30 L.Ed. 237 (1886); *Ouachita Packet Co. v. Aiken,* 121 U.S. 444, 7 S.Ct. 907, 30 L.Ed. 976 (1887).

■ Burns Waterway Harbor brings interstate commerce to Indiana; it does not keep it out. The Charge levied by the State, through which its investment in providing this service to all the State's citizens may in some measure be recovered, is not, therefore, a burden placed by the State upon interstate commerce. Improvement of its waterways is a State's sovereign right, and in exercising that right, the State may provide that users of the improvement, rather than the general public, should bear the cost.

### B.

■ The same judicial reasoning that has consistently held tolls for the use of State improvements not to interfere with interstate commerce also sustains the view that they are not unconstitutional taxes on tonnage.

The United States Constitution provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage." Article I, § 10, cl. 3. Tonnage duties are "taxes levied . . . upon ships and vessels as instruments of commerce and navigation." *Cox v. Lott* ("*The State Tonnage Tax Cases*"), 12 Wall. (79 U.S.) 204, 20 L.Ed. 370, 373 (1871). They are generally assessed "for entering or leaving a port, or navigating the public waters of the country," *Huse v. Glover, supra,* 119 U.S. at 548, 7 S.Ct. at 315, 30 L.Ed. at 490. These duties are the exclusive province of the Federal Government. 46 U.S.C. § 121 *et seq.*

But the line of cases that prohibits state levies "for the privilege of entering, trading in or lying in a port," regardless of the name or form such levies may take, *Clyde Mallory Lines v. Alabama, supra,* 296 U.S. at 265–6, 56 S.Ct. at 195–6, carefully distinguishes charges to reimburse the costs of improvements. *Clyde Mallory, supra,* at 266, 56 S.Ct. at 196; *Keokuk, supra.* As the

Supreme Court of the United States stated in *Huse, supra,* "(f)or outlays caused by such works the State may exact reasonable tolls." 119 U.S. at 548, 7 S.Ct. at 315, 30 L.Ed. at 490.

It is uncontested that Burns Waterway Harbor is an improvement paid for, at least in part, by the State of Indiana through Plaintiff. The HSC is levied upon users of that improvement. Thus neither the fact that any surplus remaining from HSC and other charges is remitted to the State general fund, Indiana Rev.Stat. § 8–10–1–17, nor the method of assessing the charge according to gross registered tonnage, changes the HSC's essential character as a toll, not a tax. The Supreme Court has spoken expressly to both contentions:

> The fact that if any surplus remains from the tolls, over what is used to keep the locks in repair, and for their collection, it is to be paid into the state treasury as a part of the revenue of the State, does not change the character of the toll or impost.
>
> \*   \*   \*   \*   \*   \*
>
> Some disposition of the surplus is necessary until its use shall be required, and it may as well be placed in the state treasury, and probably better than anywhere else.

Nor is there anything in the objection that the rates of toll are prescribed by the commissioners according to the tonnage of the vessels, and the amount of freight carried by them through the locks. This is simply a mode of fixing the rate according to the size of the vessel and the amount of property it carries, and in no sense is a duty of tonnage within the prohibition of the Constitution.

> \*   \*   \*   \*   \*   \*
>
> "The fact that the rates (of wharfage) charged are graduated by the size or tonnage of the vessel is of no consequence in this connection. This does not make it a duty of tonnage in the sense of the Constitution and the Acts of Congress." *Cannon v. New Orleans,* 20 Wall. 577 [22 L.Ed. 417]; *Cincinnati, etc., Packet Co. v.*

*Catlettsburg*, 105 U.S. 559, 26 L.Ed. 1169 (1882).

It is unnecessary to pursue the subject further.

*Huse, supra*, 119 U.S. at 548, 550, 7 S.Ct. at 315, 316, 30 L.Ed. at 490, 491.

This interpretation of the prohibition against State tonnage taxes contained in the United States Constitution should be followed in the instant case.

There is no analogy between the imposition of taxes and the levying of tolls for improvement of highways; and any attempt to justify or condemn proceedings in the one case, by reference to those in the other, must be misleading. Taxes are levied for the support of government, and their amount is regulated by its necessities. Tolls are the compensation for the use of another's property, or of improvements made by him; and their amount is determined by the cost of the property, or of the improvements, and considerations of the return which such values or expenditures should yield.

*Sands, supra*, 123 U.S. at 293, 8 S.Ct. at 115, 31 L.Ed. at 151. The HSC is therefore not a State tax on tonnage barred by Article I, § 10, cl. 3 of the United States Constitution.

### C.

■ The Fourteenth Amendment to the Constitution of the United States denies to the States the power to "deprive any person of life, liberty, or property, without due process of law." Plaintiff's Harbor Service Charge does not contravene this provision.

This question too was laid to rest by the Supreme Court in *Sands v. Manistee River Improvement Co., supra*, where a Fourteenth Amendment challenge was mounted against charges by the State of Michigan for use of an improved waterway. The improvements consisted of the elimination of obstacles, the cutting of new channels, and the confinement of a stream by artificial embankments. The river as improved was suitable for the floating of logs and lumber, a use impossible given the waterway in its natural state. Michigan allowed a private company to impose a fee, approved and controlled by the State, upon users of the stream.

Defendant in *Sands*, like Defendants here, was a user of the improved waterway who refused to pay the assessments. It challenged the constitutionality of the State statute authorizing the establishment of tolls, and especially the lack of formal notice-and-comment provisions regarding their validity.

The Supreme Court rejected this challenge, saying:

The plaintiff in error, the defendant below, misapprehends the purport of the provision that no State shall deprive one of property without due process of law, when he considers the exaction of tolls under a statute for the use of an improved waterway as a deprivation of property within its meaning. There is no taking of property from him by such exaction within the prohibition, any more than there is a taking of property from a traveler, in requiring him to pay for his lodgings in a public inn. There is in such a transaction only an exchange of money for its supposed equivalent. The tolls exacted from the defendant are merely compensation for benefits conferred, by which the floating of his logs down the stream was facilitated.

123 U.S. at 293, 8 S.Ct. at 115, 31 L.Ed. at 151.

If there is no Fourteenth Amendment infirmity in the exaction of tolls by a private company under State supervision, then it follows *a fortiori* that the State itself may constitutionally do the same. "Regulations of tolls or charges in such cases [*i.e.* where the toll is assessed to meet the costs of improvements] are mere matters of administration, under the entire control of the State." *Sands, supra*, 123 U.S. at 293, 8 S.Ct. at 115, 31 L.Ed. at 151.

Plaintiff Indiana Port Commission was established to accomplish a public purpose enunciated in its authorizing legislation: "to promote the agricultural, industrial and commercial development of the state, and

to provide for the general welfare." Indiana Rev.Stat. § 8–10–1–1. *See Orbison, supra,* 242 Ind. 385, 179 N.E.2d at 737. The tariff of the Commission was promulgated in accordance with statutory requirements. Plaintiff's compliance with these applicable rules has never been questioned by Defendants or anyone else.

Neither these defendants nor any other user of Burns Waterway Harbor is deprived of property without due process of law, in contravention of the Fourteenth Amendment, by being required to pay the Harbor Service Charge.

### III.

### A.

Section 4 of the Rivers and Harbors Appropriation Act of 1884 (Act of July 5, 1884, c. 229, § 4; 23 Stat. 147; 33 U.S.C. § 5), as amended, reads, in pertinent part:

> No tolls or operating charges whatever shall be levied upon or collected from any vessel, dredge, or other water craft for passing through any lock, canal, canalized river, or other work for the use and benefit of navigation, now belonging to the United States or that may be hereafter acquired or constructed.

The 1884 statute was a general appropriations act "for the construction, repair, and preservation of certain works on rivers and harbors, and for other purposes." Its principal purpose was to appropriate $12,619,100 for several hundred public works projects, and to reject certain other proposals. Improvements were to be paid for out of appropriations, not revenues. This is the legislative context of 33 U.S.C. § 5, which directs that Federal projects not levy tolls.

In support of the Act, the Committee on Rivers and Harbors of the House of Representatives submitted a Report. As to § 4 of the Act, the Committee stated:

> Another provision prohibits tolls or operating charges from being levied or collected upon vessels passing through any canal, or other work, for the improvement of navigation belonging to the United States. Operating charges under proper restrictions are to be paid by requisition upon the Secretary of the Treasury. This is the existing law as to Des Moines, Portland, and Saint Mary's canals, and there seems to be no good reason for not putting all similar Government works upon the same footing. Without such a law the failure of one river and harbor bill may seriously embarrass navigation.

Report No. 1526 (48th Cong., 1st Sess.), p. 6 (May 7, 1884). This context and history clearly show that Congress was directing that the Federal Government not charge tolls, and was not addressing the power of the States.

The Act does not purport to change then-existing law with respect to the rights of States to levy tolls for the use of improved waterways.

Section 4 of the Act of 1884, 33 U.S.C. § 5, has been described as "essentially a maintenance provision," allowing Federal funds to be used in certain circumstances for reconstruction of port improvements. *Atchison, Topeka and Santa Fe Railway Co. v. Callaway,* 382 F.Supp. 610, 616 (D.D.C. 1974). It has never been used to strike down State charges. Thus in *Huse, supra,* for example, the Federal Government concededly contributed to the improvement of the waterway, and yet State tolls were upheld without mention of 33 U.S.C. § 5.

In 1885, less than a year after its enactment, then Attorney General Garland explained the purpose of § 4 to the Secretary of War.

> A necessity existed for making some provision to meet the current expenses of operating and keeping in repair the works of the Fox and Wisconsin Rivers improvement, since the abolishment of tolls thereon; and while there can be no doubt that the indefinite appropriation provided by section 4 of the act of 1884 was meant to apply to those works, there is also strong ground for the inference that it was intended to be limited to *works of that class,* in whose use both operating expenses and expenses for repairs are necessarily incurred (the object

being, as the statute itself declares, to prevent interruption to their use and to the navigation thereof for want of funds to pay such expenses), and not to extend to river and harbor improvements generally.

18 Op. Atty. Gen. 188, 192 (May 28, 1885), (emphasis in original).

## B.

■ Section 4 of the Act of 1884, 33 U.S.C. § 5, refers to works "belonging to the United States." Burns Waterway Harbor does not belong to the United States and therefore does not come within that Section.

The Army Corps of Engineers contributed to the cost of Harbor construction. It did so pursuant to authorization contained in the River and Harbor Act of 1965, Pub.L. 89–298, § 301. That statute "authorized to be prosecuted under the direction of the Secretary of Army and supervision of the Chief of Engineers," certain improvement projects. Among them was

> Burns Waterway Harbor, Indiana: House Document Numbered 160, Eighty-eight Congress, at an estimated cost of $25,000,000. The Secretary of the Army may reimburse the State of Indiana for the expenditure of funds used to construct such portions of the project as approved by the Chief of Engineers and constructed under the supervision of the Chief of Engineers. Unless construction of the project is initiated within three years from the date of enactment of this Act, the authority to reimburse the State of Indiana contained in this paragraph shall expire. The State of Indiana shall furnish assurance satisfactory to the Secretary of the Army that water and air pollution sources will be controlled to the maximum extent feasible in order to minimize any adverse effects on public recreational areas in the general vicinity of the Harbor. No appropriation is authorized to be made by the construction of this project until the Indiana Dunes National Lakeshore has been voted upon by both Houses of Congress during the same Congress.

Plainly, this language does not indicate that the Harbor would "belong to" the United States; equally plainly, it was not even to be "constructed by" the Federal Government. Rather, the Corps of Engineers was to reimburse the State for its expenditures. Title to all of the land under the water in the Harbor, with the sole exception of the land beneath the outer breakwaters, remains in Plaintiff and Defendants.

HSC is not a toll upon the use of any work owned, constructed, or acquired by the United States. The charge therefore does not offend against the provisions of 33 U.S.C. § 5.

## C.

■ The culmination of nearly ten years of litigation with respect to the applicability of the Shipping Act of 1916, 46 U.S.C. § 816, ended with the D.C. Court of Appeals decision. The Federal Maritime Commission had ruled that the charge did not come within its purview, and ordered IPC to delete from the HSC from its tariff filed with that Agency.

As to the FMC determination that the charge is "not subject to Section 17 of the Shipping Act of 1916," the United States Court of Appeals for the District of Columbia Circuit stated simply, "We agree." No appeal from this decision was taken.

The Shipping Act therefore poses no impediment to assessment of the Harbor Service Charge.

## D.

■ In 1909, a treaty was signed by the United States with the United Kingdom, relating to boundary waters between the U.S. and Canada. 36 Stat. 2448; T.S. 548; 12 Bevans 319 (signed January 11, 1909; entered into force May 5, 1910). This Treaty is the law of the land, under Article VI of the Constitution of the United States. The first Article of the Treaty provides in pertinent part as follows:

The High Contracting Parties agree that the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants, ships, vessels, and boats of both countries. It is further agreed that so long as this treaty shall remain in force, this same right of navigation shall extend to the waters of Lake Michigan ...

The expression "free and open" in Article I of the Treaty cannot be read to mean without charge. Rather, "free and open" refers to the accessibility of the boundary waters, without discrimination, to the vessels of the High Contracting Parties. It is not alleged that any vessel of Canadian or British registry has ever been the victim of selective or discriminatory assessment of the HSC.

The obligations of the United States under Article I of the Treaty are expressly stated to be "subject, however, to (its) laws and regulations." Thus so long as shipping is validly subject to regulation, there is no violation of the Treaty if that regulation is non-discriminatory.

### E.

■ The Ordinance for the Government of the Territory of the United States Northwest of the Ohio River, of 1787 ("the Northwest Ordinance"), provides in Article IV, in pertinent part:

The navigable waters leading into the Mississippi and Saint Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory as to citizens of the United States, and those of any other States that may be admitted into the confederacy, without any tax, impost, or duty therefor.

When Indiana became a State, in 1816, it gave its covenant to adhere to the Ordinance.

For reasons already amply expounded, however, the HSC is in no way inconsistent with the Ordinance. First, the HSC is not a "tax, impost, or duty" for the use of navigable waters. See pp. 13–19, *supra; Orbison, supra,* 242 Ind. 385, 179 N.E.2d at 743 ("fees are to be paid by the users of the port or its facilities, but this is merely compensation for the use of the property and the improvements of the port and can in no sense be considered a tax.")

Also, the objection that the Northwest Ordinance prohibits charges for the use of improved waterways has on many occasions been expressly rejected by the Courts: *Sands, supra; Huse, supra; Nelson, supra.* As the Supreme Court of Michigan noted in *Nelson,* tools such as these

are not charged for the use of the navigable river thus made free, but are imposed in respect to the improvements, and to obtain the benefit thereof ... (T)he compact itself might have been a curse to the territory instead of the blessing it was meant for, had it required the water highways of the territory to remain unimproved in order that they might be used in their natural condition without toll or impose (sic)

44 Mich. 7, 5 N.W. 998 at 1001, citing *Benjamin v. Manistee River Improvement Co.,* 42 Mich. 628, 4 N.W. 483 (1880).

Thus the Northwest Ordinance is not violated by the HSC, nor is the covenant given by Indiana when it joined the Union. Nor can it be argued that the State law by which the HSC is authorized is a law impairing the obligation of a contract implicit in the Ordinance, in violation of Article I, § 10 of the Constitution:

There was no contract in the fourth article of the Ordinance of 1787 respecting the freedom of the navigable waters of the territory northwest of the Ohio River emptying into the St. Lawrence, which bound the people of the territory or of any portion of it, when subsequently formed into a State and admitted into the Union.

870

*Sands, supra,* 123 U.S. at, 293, 8 S.Ct. at 115, 31 L.Ed. at 151.

### IV.

### A.

█ Plaintiff Indiana Port Commission was created by statute in 1961. Indiana Rev.Stat. § 8–10–1–1 et seq. As noted on p. 860 supra, it was created for certain public purposes, including the construction of "a modern port on Lake Michigan."

The Commission was empowered by its enabling legislation, inter alia. "(t)o fix and revise from time to time and to collect fees, rentals, tolls and other charges for the use of any port or port project," Indiana Rev. Stat. § 8–10–1–7(h), and generally to "do all acts and things necessary or proper to carry out the powers expressly granted" to it. Indiana Rev.Stat. § 8–10–1–7(p). It may adopt bylaws, rules and regulations "as it may deem advisable," for control of the ports and for similar purposes. Indiana Rev.Stat. § 8–10–1–9. Its statute, "being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effect the purposes thereof." Indiana Rev.Stat. § 8–10–1–24.

Specifically with respect to fees, tolls, rentals, and other charges, the Act provides that

(t)he commission shall be authorized to fix, review, charge and collect fees, tolls, rentals and other charges for the use of the port, port projects, terminal facilities and lands under the jurisdiction or control of the commission or services rendered by the commission, and the aggregate thereof shall provide revenues at least sufficient to pay the cost of operation, maintenance and repair of the port and terminal facilities, including the administration expenses of the commission, and in case revenue bonds are issued sufficient to pay the interest on and principal of the bonds in accordance with their terms, also sufficient to establish and maintain reserves created for all such purposes and for depreciation purposes. The fixing and collection of such fees, tolls, rentals and other charges and the

expenditure of the revenues derived therefrom shall not be subject to the supervision or regulation by any other officer, commission, board, bureau or agency of the state. After such bonds have been fully paid and discharged and all obligations under any trust agreement securing the same have been performed or satisfied, any remaining surplus net revenues and all surplus net revenues thereafter derived from the operation of such port shall be paid into the state general fund.

Indiana Rev.Stat. § 8–10–1–17.

The Harbor Service Charge comports fully with the mandates of these provisions. The enabling legislation has been fully sustained by the Indiana Supreme Court in challenges to its (State) constitutionality and consistency with other laws. *Orbison, supra.*

Plaintiff is, under Indiana law, an agency or instrumentality of the State, and yet is separate from the State in its sovereign capacity. *Orbison, supra,* 242 Ind. 385, 179 N.E.2d at 734, 737, 738; 1965 Op.Atty.Gen. (of Indiana) 185, 186 (September 17, 1965). It is a creature of statute, and to the extent that its acts are consistent with its enabling legislation, they are fully enforceable.

█ The official acts of the Commission are, like all acts of public agencies, judicially reviewable. Nor does the statute (at § 8–10–1–17, *supra*) provide otherwise. That the fixing of charges "shall not be subject to the supervision or regulation by any other officer, commission,board, bureau, or agency of the state" in no way implies a claim of immunity from judicial review. Such a claim would be bound to fail. *Orbison,* supra, 179 N.E.2d at 745 ("any discretionary order of the Commission, directly and substantially affecting the lives and property of the public, is subject to judicial review regardless of whether the Act contains a provision to that effect or not.") See also, *Warren v. Indiana Telephone Co.,* 217 Ind. 93, 26 N.E.2d 399 (1940); *State ex rel. Smitherman v. Davis,* 238 Ind. 563, 151 N.E.2d 495, 498 (1958).

The HSC was established pursuant to discretion conferred upon Plaintiff by the Indiana General Assembly. While it is therefore subject to judicial review, it must be upheld unless it is fraudulent, arbitrary or capricious, or otherwise illegal." *Smitherman, supra,* 151 N.E.2d at 498. Arbitrary or capricious action refers to acts which are "wilful and unreasonable ... without consideration and in disregard of the facts or circumstances of the case ... taken without some basis which would lead a reasonable and honest man to such action." *State Board of Tax Commissioners v. Chicago, M., St. P. & P. Railway Co.,* 121 Ind.App. 302, 96 N.E.2d 279, 282 (1951).

Defendants do not allege, nor could they allege on these facts, that the HSC is unconscionable or oppressive in amount. Such an argument would be similar to that rejected in *Cincinnati, etc., Packet Company, supra,* where the Supreme Court upheld a city wharfage charge even when the city appeared to have recovered its entire investment. 105 U.S. at 562, 26 L.Ed. at 1171.

■ The argument that the HSC is arbitrary or capricious involves a heavy burden that its proponents must bear. On this record, it is clear that the HSC is not arbitrary or capricious for inter alia the following reasons:

a) the charge is expressly authorized by law (*see* pp. 872–873, infra);

b) as contrasted with Defendants, Plaintiff has no other way of recovering its initial investment in the Harbor (*see* Exhibit C, ¶¶ 10, 24; Exhibit I, ¶ 6)

c) some of Plaintiff's initial investment in the Harbor was and remains unreimbursed (*see* Exhibit C, ¶¶ 7, 8);

d) Plaintiff has provided other benefits and/or incurred cognizable and measurable detriments in connection with the Harbor project, for the advantage of all users (*see* Exhibit I, ¶ 3); and

e) Plaintiff remains liable on certain outstanding obligations with respect to the Harbor, such as the obligation to hold the United States harmless for resulting damages to third parties (see Exhibit I, ¶ 3(h); and Exhibit J).

It should be noted here that while the burden of proof before the FMC in earlier stages of this proceeding may have been the Commission's, this is no longer the case. Thus for this Court to strike down the Charge, it would be necessary to hold that such considerations as (a)–(e) above are "unreasonable" or "in disregard of the facts." See *Chicago, etc., supra,* 96 N.E.2d at 282. Manifestly they are not. The Charge is a reasonable and indeed a necessary way for Plaintiff to recover its investment, which investment inured and continues to inure to the benefit of all users of the Harbor. This line of reasoning is fully consistent with the decision of the Court of Appeals in *Indiana Port Commission, supra,* 521 F.2d at 285, 287.

Nor is there an estoppel operating to deny Plaintiff the right to argue recovery of its investment as the primary basis of the Charge.

The tariff currently in force does not attempt to state the "purpose" of the HSC. See the Annex to Exhibit C. Furthermore, no explanation or rationale is required by Indiana law which authorizes the HSC, Indiana Rev.Stat. § 8–10–1–17, and no such requirement is imposed by general administrative law. The substance of the published tariff was the imposition of certain charges with provisions for their collection.

■ Generally, an administrative agency's interpretation of its own statute is entitled to great judicial deference. "Even though reasonable, and even eminent, minds may differ as to the relative wisdom of the challenged regulation," the Court should, absent arbitrariness or capriciousness, defer to the agency upon whom the General Assembly conferred appropriate authority. *Graham v. National Transportation Safety Board,* 530 F.2d 317, 319 (8th Cir. 1976). This principle would seem to apply especially strongly here, where the power to levy charges was expressly conferred with a minimum of procedural requirements. It is not necessary for Plaintiff to prove mathematically that for every

dollar of HSC paid, Defendants and the other users of the Harbor receive a dollar's worth of services or benefits in return. Rather, it is for Defendants to demonstrate that Plaintiff is acting arbitrarily, capriciously, or in excess of its legal authority in levying the Charge.

## V.

### A.

■ Plaintiff assesses the Harbor Service Charge on each and every commercial vessel entering the Harbor, with exceptions noted in the tariff. In 1980, for example, 724 ships and barges were liable for payment of the Charge. These were owned by at least 66 different owners of approximately 20 different nationalities. It is therefore not practical to seek to collect HSC which is generally a small amount of money, averaging roughly $80 per vessel in 1980 from the individual owners. The costs of preparing and sending separate invoices, of acquiring the addresses of the owners and of collecting the amounts due, would rapidly exceed the revenues generated.

The tariff therefore provides that "(e)very vessel *by its master, agent, or owner*" shall pay the HSC. (emphasis added). Leases of public port facilities expressly provide that lessees shall be liable for HSC assessed on vessels calling at their leased facilities. Defendants are not lessees. Plaintiff has since 1970 sent Defendants invoices for HSC payable on all vessels calling at their docks, regardless of ownership.

IPC contends that it is standard commercial practice for the local owner of dock facilities to be deemed an agent for the shipowner for such a purpose. Implied agency is a familiar concept, and its invocation is especially appropriate on facts like those presented here. See, generally, 3 Am. Jur.2d *sub voc.* Agency, § 18.

Defendants have since 1970 been well aware of the terms of the tariff, and of Plaintiff's intention to seek collection from them. They can, if necessary, easily adjust their commercial relations with shipowners with whom they deal, to take account of liability for the Charge. The vessels calling at Defendants' docks are doing so in pursuance of Defendants' commercial purposes.

Plaintiff, on the other hand, has little choice but to seek collection in the way it currently employs. Considering the commercial realities, the normal expectations of the parties, and the breadth of the Commission's statutory mandate, it is not arbitrary or capricious for Plaintiff to bill Defendants for HSC payable on vessels calling at their terminals. The provision of the tariff establishing the liability of agents is entitled to the same deference as the establishment of the Charge itself. For the reasons stated, it too should be upheld.

■ There are four categories of vessels exempt from payment of the Charge. From this it does not follow that either Defendant here is entitled to a blanket exemption.

By the terms of the 1962 agreement between Plaintiff and defendant Bethlehem IPC agreed to allow Bethlehem vessels "access to and across the waters of the outer harbor under the same terms and conditions extended to all other vessels making use of Burns Waterway Harbor." It does not follow from this that Bethlehem is entitled to an exemption from the HSC generally if any category of vessels is exempted.

First, the reference in the agreement to "the same terms and conditions" and "the same regulations" should be taken to mean the tariff as a whole. On this plainly correct reading, Bethlehem is now being afforded access to the Harbor in full conformity with the agreement. That is, Bethlehem vessels and Government vessels, for example, are both regulated by the tariff. Under the tariff, however, certain Government vessels are granted an exemption while Bethlehem vessels are not.

The clause is not a "most-favored-nation" clause, as it has occasionally been portrayed. "Most-favored-nation" treatment (officially called "nondiscriminatory treatment" in U.S. international trade legislation, see 19 U.S.C. § 2481(9)) refers to tariff treatment of a nation's exports that is no less favorable than that accorded to the products of any other nation.

But the Commission did not agree to make Bethlehem its most favored user in this sense. It agreed only to subject Bethlehem's shipping to the same rules as all others. It did not thereby cede or waive its right to provide for reasonable, non-arbitrary exemptions from charged under the tariff. The provisions of these reasonable categories of exemptions is a "mere matter( ) of administration, under the entire control of the State." *Sands, supra,* 123 U.S. at 293, 8 S.Ct. 115, 31 L.Ed. at 151. Paragraph 10 of the Bethlehem agreement does not constitute the State's abandonment of this control.

■ Other than the four categories that are exempt, all commercial vessels are liable for HSC. No tenant at the public port facilities has an agreement which waives or forgive the Charge. Some tenants have leases calling for the payment of minimum annual fees, which means that they may be liable for the payment of minimum annual fees, which means that they may be liable for HSC even beyond what is payable by vessels calling at their docks.

In the first proceedings before the Federal Maritime Commission, the FMC held that unreimbursed expenditures of IPC in constructing the Harbor were a part of a "quid pro quo" between Plaintiff and Defendant Bethlehem. It rejected these costs as the basis for the Charge (under § 17 of the Shipping Act, 46 U.S.C. § 816), holding that collection would constitute "double recovery" for the Commission.

The Court of Appeals rejected this entire approach. *Indiana Port Commission, supra,* 521 F.2d at 287. Nevertheless, on remand, Administrative Law Judge seemed influenced by the "quid pro quo" arguments.

The Administrative Law Judge held that IPC bore costs for the benefit of all users, but so did Bethlehem and Midwest. He appeared to reason that since benefits conferred upon all users of the Harbor "are proportionate to the costs of construction of each of the parties," then its capital contribution may not be invoked by the Commission as the basis for the Charge.

Even though the question of locating a "basis" for the HSC has since been freed of the constraints of the Shipping Act, it is important to reiterate why this conclusion is incorrect. It is incorrect for this reason: Defendants are private commercial enterprises, which can recover their costs in many and varied ways. Plaintiff is a State agency, directed by law to be self-sufficient. Defendants are aware, when they make a commitment to incur construction costs, that these costs can be recovered, or that they can be absorbed. Plaintiff is required to recover its costs out of fees, charges, and rents. That all users may have derived benefits from Defendant's contributions to the building of Burns Waterway Harbor is wholly irrelevant to the question whether the State may charge all users in order to recover the investment made by it.

A careful review of the record here discloses that Plaintiff is entitled to judgment as a matter of law and the same is accordingly entered.