## DANIELS *v.* INDIANA TRUST COMPANY

[No. 27,926.   Filed December 20, 1943.]

*J. W. Fesler, Harvey J. Elam, Howard S. Young, Irving M. Fauvre,* and *Paul N. Rowe,* all of Indianapolis, for appellant.

*Barnes, Hickam, Pantzer & Boyd,* and *Dailey, Davis & Hartsock,* and *Dowden, Denny & Adams,* all of Indianapolis, for appellee.

FANSLER, C. J.—This is an action by the appellant as plaintiff, begun in 1939, to recover funds deposited by the Van Camp Products Company with the appellee, between 1913 and 1930, to be used in the purchase and redemption of first preferred stock of the company, and which were used for that purpose by the appellee. The complaint seeks to recover $346,923.20 with interest, amounting in all to more than $600,000. There was a trial by the court and judgment for the defendant.

Error is assigned upon the overruling of a motion for a new trial, which was upon the ground that the decision of the court is not sustained by sufficient evidence and is contrary to law.

There is no substantial conflict in the evidence. The Van Camp Products Company was incorporated under the laws of this State in February, 1912. In addition to its common stock, it issued and sold to the public, through a subsidiary, six thousand shares of 7 per cent. first preferred stock of the par value of $100 per share. Among the provisions in the first preferred stock certificate is the following: "The Van Camp Products

Company is required to set aside each year after the payment of full dividends cumulated, at least Ten Per Cent (10%) of the net or surplus earnings and income of each fiscal year, beginning for the year 1912 with the date of the organization of the Company and ending December 31st, 1912, and beginning thereafter January First of each and every year, as determined by the annual audit to be made by auditors to be appointed by the Registrar, which sum is to be applied, for the period of four (4) months thereafter and no more, to the purchase of said First Preferred Shares outstanding, if and to the extent that the same can be purchased at or below One Hundred Ten Dollars ($110.00) per share and accrued dividends, after like notice by mail and by publication in New York, Chicago and Indianapolis. All shares thus acquired shall be immediately delivered to the Registrar for cancellation and cancelled. Such notice shall call for tenders of shares, and shall be mailed and first published within thirty (30) days after the end of each fiscal year, and if not sufficient are tendered to consume the entire amount to be set aside and applied within three (3) months, the balance, or if no shares have been purchased, the whole amount, shall be deemed and taken as surplus funds and assets of the Company and shall not be subject to distribution on Common Stock, after such mailing and publication, unless and until the total aggregate surplus funds thus accumulated has reached an aggregate total equal to the aggregate par value of First Preferred Shares issued and then outstanding."
By the terms of the certificate, the holder is entitled to the rights and benefits of the provisions of a contract between the issuer and its selling agent, which contract is printed on the back of the certificate. This contract contains a provision in all respects substan-

tially the same as the one quoted, except that it provides that:

"There shall be an annual examination and audit of, and report upon, the accounts, affairs and condition of the Company as of December 31st, by a Certified Public Accountant, approved by the Registrar then acting of the said stock, and inventory under the supervision of such accountant, who shall determine and report, among other things, the amount of the 'net earnings,' the 'net quick assets,' and the gross sales for the purposes of any computation contemplated herein. A copy of such report shall be delivered to the Registrar then acting of said stock within thirty (30) days after the close of each such year, subject to your inspection.

" 'Net earnings' shall mean the gross earnings from all sources, less all current expenses, taxes, insurance, losses, and the amount deemed by said accountant adequate for depreciation."

Annually, for eighteen years, the books of the company were audited by a well-known firm of auditors and accountants. Whether the auditors were appointed by the registrar, or by the company and approved by the registrar, does not appear. During the years 1913 to 1930, inclusive, the company deposited with the appellee for the redemption of its preferred stock $456,788.14. Of this amount, $349,440.37 was disbursed by the appellee in the redemption of 3,605½ shares of preferred stock. The balance of the deposits, plus $2,774.32 interest credits, and less $257.15, expense of printing and mailing, or a total of $109,864.94, was returned to the company or its receiver. The following table shows the date of the accountant's report, the date of the deposit for stock redemptions, and the amount of the deposit, for each year:

| "Year | Date of Accountant's Report | Date 10% Earnings Deposited | Amount of Deposit |
|---|---|---|---|
| "1912 | February 14, 1913 | February 19, 1913 | $15,790.18 |
| "1913 | March 16, 1914 | March 17, 1914 | 6,802.55 |
| "1914 | March 11, 1915 | April 14, 1915 | 10,697.32 |
| "1915 | March 18, 1916 | March 21, 1916 | 3,538.81 |
| "1916 | May 29, 1917· | May 29, 1917 | 47,774.58 |
| "1917 | February 27, 1918 | May 4, 1918 | 35,204.69 |
| "1918 | June 3, 1919 | July 8, 1919 | 31,597.20 |
| "1919 | May —, 1920 | August 12, 1920 | 22,834.61 |
| "1921 | February 10, 1922 | April 26, 1922 | 19,899.81 |
| "1924 | April 29, 1925 | May 20, 1925 | 5,456.80 |
| "1925 | April 21, 1926 | June 28, 1926 | 18,642.37 |
| "1926 | May 28, 1927 | June 30, 1927 | 77,534.21 |
| "1927 | June 14, 1928 | December 31, 1928 | 20,580.68 |
| "1928 | April 3, 1929 | June 1, 1929 | 67,598.14 |
| "1929 | April 25, 1930 | October 21, 1930 | 52,334.79" |

On receipt of the deposit each year, the appellee mailed, and each preferred stockholder received, notice together with a form of tender. This notice invited the shareholders to tender shares they desired to sell on or before a fixed date, which in every instance was prior to the expiration of four months immediately following the date the redemption fund was deposited with the appellee, and within three months immediately following the date of the notice. All but a few of the shares purchased and redeemed were tendered and purchased within the dates fixed in this notice.

Appellant's action is based upon the theory that the appellee, acting either as agent or trustee, received the various deposits in question under a contract, by the terms of which it agreed to redeem stock in strict compliance with the terms of the preferred stock agreement; that the preferred stock agreement required that

a notice be given in January of each year, and that the four-month period for the redemption of stock expired at the end of April; that all shares purchased or redeemed after the end of April in each year were redeemed contrary to the terms of the agreement; that the preferred stockholders whose stock was not redeemed were injured thereby, since, if the stock had not been redeemed, the fund would be in the hands of the issuing company and available for the redemption of outstanding preferred shares.

The contract under which the appellee received and disbursed the fund in question must have been an oral agreement, since it is not a part of the preferred stock agreement or the selling agreement.

The appellee is named as registrar in the preferred stock contract, but there is nothing in that contract or the selling agreement designating the appellee as the agency through which the annual redemption of preferred stock out of annual profits is to be accomplished. The contract indicates that the corporation itself is to purchase the stock, and provides that: "All shares thus acquired shall be immediately delivered to the Registrar for cancellation and cancelled." In redeeming the stock the appellee did not act as registrar, but acted in some other capacity. The burden was upon the plaintiff to show the character of the contract under which the appellee acted, and a breach thereof. The representatives of the Van Camp Products Company and of the appellee who made the oral contract are gone. The only available evidence is the records.

The appellant contends that, since the appellee was familiar with the terms of the preferred stock contract, it must be assumed that it received the various deposits, either as trustee for the preferred stockholders or as agent for the Van Camp Products Company, under an

agreement that it would apply the deposits in the manner in which the Van Camp Products Company was required to apply them under the terms of the contract. There is no direct evidence of this, and, while there are some circumstances that may tend to support such a view, there are many facts strongly supporting a contrary conclusion. But, before examining the evidence upon this subject, we have examined the contract with a view of ascertaining whether the funds were applied in conformity therewith.

The provision in question obligates the issuing company to apply 10 per cent. of each year's net earnings to the purchase of first preferred shares, if such are available for purchase, at or below $110 per share. The holders of the shares are not required to sell at this price. The provision is for their benefit, and it is obligatory upon the issuer only. This is the essence of the contract. There is a limitation upon the duty of the company. It is required to make the fund available for the purchase of shares for four months only. After that period the whole amount, or the balance, becomes surplus funds and assets of the company, available for all purposes except "distribution on Common Stock." It is true that the contract provides that the first notice shall be mailed within thirty days after the last day of December, but it also provides that the amount of "net earnings" shall be determined by a certified public accountant, a disinterested agency, and that in determining the net earnings there shall be taken into consideration "the amount deemed by said accountant adequate for depreciation." The privilege of having stock redeemed out of net earnings was a valuable right which accrued to the shareholders. The amount of net profits to be applied to the purchase of stock could be ascertained only by the auditing ac-

countants, and only upon completion of their audit. It seems clear therefore that the notice to the shareholders could not be given until the audit was completed. It seems to have been assumed when the contract was made that the audit would always be completed during January, so that the notice could be given within thirty days after the end of the fiscal year. But it surely was not contemplated that the obligation of the company to set aside 10 per cent. of its earnings, and to apply the same to redemption of stock over a four-month period, should be dependent upon the speed with which the audit was completed. It is unreasonable to assume an intention that, if the completion of the audit was delayed until the last of April, the requirement for redemption of stock out of earnings was to be inoperative, or that if the notice could not be given in January, the four months in which stock might be offered was to be reduced. There is nothing inherent in the first four months of the year that would make stock redemptions in such months more desirable, or redemptions in succeeding months less desirable. It cannot be seen that the contract would have been any less attractive to the shareholders if it had provided for notice within thirty days after the last day of April. It must be concluded that the time of the notice is not of the essence or substance of the contract; that the substantial element is the setting aside of the fund, and the opportunity of the shareholders to sell their shares and have them redeemed during a four-month period. Nor is the manner of giving notice of the essence of the contract. Provision is made for notice by mail and by publication in New York, Chicago, and Indianapolis. Actual notice is not required. Publication would be constructive notice, but the record discloses that all shareholders had actual notice, and this was sufficient com-

pliance with the contract. The record discloses that at no time was the audit completed during January; that each year 10 per cent. of the net surplus earnings were set aside after the report of the auditors; that in each year the shareholders had actual notice by mail; that all of the stock purchased and redeemed, except a few shares, was purchased and redeemed within four months after the giving of notice, and within three months after the date of the notice, and that the unused balances were returned to the company. This was a substantial compliance with the contract. The right to sell and surrender shares was open to all shareholders alike for a four-month period. It is true that the four-month period was not the months of January, February, March, and April each year, but the privilege of the shareholders was not substantially impaired by this slight variation in the time in which they might take advantage of it, or at least there is no proof of, or attempt to prove, any such result. The issuing company acquired no substantial advantage by the slight delay in performing its obligation, and the shareholders lost no substantial right. The auditors, in their annual reports, referred to the requirement that 10 per cent. of the net income each year shall be set aside and applied to the purchase of stock for four months, without mentioning the time at which it should be applied, which seems to justify the conclusion that they did not consider time as of the essence of the contract. Each of the shareholders had notice each year, and none of the notices were given during January, and in all of them the four-month period was indicated as extending beyond April, and it does not appear that any objection or question was made by any shareholder. In each year the Van Camp Products Company deposited the fund with the appellee at a time at which it was impossible

to give notice in January. The appellee reported its procedure to the Van Camp Products Company annually or oftener, showing the dates involved, and all of these reports were expressly approved by resolutions of the company's directors. All of this indicates a construction of the contract consistent with its essential provisions, followed from the year 1913 until 1930, and acquiesced in by all parties concerned. Since it does not appear that the departure from the letter of the contract respecting notice could have been avoided, and since there was no showing that any substantial rights were invaded by the immaterial variance in time of performance, there is no basis for any recovery in respect at least to the funds that were used for the purchase and redemption of stock within four months following each annual audit, and within three months after the notice.

Some few shares of stock were purchased and redeemed at periods beyond the four months. These purchases were reported to and expressly approved by the board of directors of the Van Camp Products Company within the year in which each purchase was made. The evidence does not disclose any breach of duty owing to the Van Camp Products Company in making these purchases, and, so far as the record shows, they may have been made at the express direction of the officers of the company.

But the appellant says that this action is maintained not for the benefit of the company, but for the benefit of the preferred shareholders, to whom distribution of the proceeds of the action will be made. (There are no creditors.) Was there a breach of any duty owing to the preferred stockholders in the redemption of these few shares of stock?

The appellant asserts that the appellee was the trus-

tee of an express trust for the benefit of the preferred shareholders; that the funds involved were deposited with the appellee under a contract, by the terms of which it agreed to disburse the funds in conformity with the terms of the preferred stock agreement. The appellant as plaintiff had the burden of proving that there was such a contract. There was no written contract, nor is there any direct evidence of an oral contract, since all of those who acted for the parties are gone. But the appellant says that such a contract must be inferred from the conduct of the parties in transacting the business. The appellant leans heavily upon the entries in appellee's ledgers in which the account was carried. The account was originally entitled "Van Camp Products Company First Preferred Stock Redemption Fund," and in 1913 there was an entry "for redemption of 1st. Pfd. Stock in accordance with terms of selling agreement," and after 1922 the account appeared as "account of Trustee Van Camp Products Company Redemption Fund First Preferred Stock." But the use of the word "trustee" in connection with the deposits is not controlling. *Rowe, Trustee,* v. *Rand, Receiver* (1887), 111 Ind. 206, 12 N. E. 377; 2 C. J. S., Agency, § 2, p. 1035, and cases cited, n. 44. The words "trust" and "trustee" are frequently used to indicate duties, relationships, and responsibilities, which are not strictly and technically trusts. In the broad sense every agent is a trustee. *Holsapple et al.* v. *Shrontz* (1917), 65 Ind. App. 390, 117 N. E. 547. The entry that recites that the fund was for redemption of stock in accordance with the terms of the selling agreement lends some support to the appellant's contention, but, as against these circumstances which tend to indicate that there was a trust agreement, and that there was an express contract that

the appellee was to construe and follow the terms of the stock certificate, the great body of the evidence points in the other direction. There is evidence that when depositors desired to have the trust company make disbursements of particular funds according to instructions, it was the custom to carry the account in the trust department, and it is not unreasonable to conclude, in the light of the other evidence, that the word "trustee" was used in the bookkeeping entries because the account was in the trust department. And even if the trial court had concluded that there was a trust, there is absolutely nothing in the evidence that would compel the conclusion that the trust was for the benefit of the preferred shareholders, or anything more than a trust for the benefit of the Van Camp Products Company, which was the trustor. If it was such, the trustor cannot complain about a change in procedure made upon its direction or with its approval. But there is no clear and compelling evidence of the terms of the contract. Ordinarily trusts are not resorted to for carrying out such transactions. The evidence does not point with certainty to anything more than such an arrangement as is frequently made between a principal and a broker or banker, in which the agent is furnished with funds with which to acquire certain securities, upon certain terms, for the account of the principal. Such an arrangement may be changed at the will of the parties. On appeal it is not enough that the evidence might support some other conclusion. It must positively require the conclusion contended for by the appellant before there is basis for reversal.

The action of the appellee in redeeming the few shares of stock under discussion was promptly reported

to the Van Camp Products Company and expressly approved by the directors. This required a conclusion either that the stock was purchased and cancelled at the direction of the corporation, or, having been purchased upon the initiative of the appellee without, or contrary to, instructions, the action was ratified by the directors, which ratification would have the same effect as though the purchase had been expressly directed by the corporation in the first instance. This, says the appellant, was a breach of the contract between the corporation and its preferred shareholders. But we know of no rule of law that requires a banker or broker or fiscal agent, who is directed to make purchases of securities for his principal, to ascertain at his peril whether the principal is acting within the terms of his contract with some third party, and no such rule is suggested.

But the appellant says: "To redeem preferred stock under the circumstances and in the manner shown by the evidence was not only a breach of the preferred stock contract, but it was beyond the power of the corporation." The preferred stock contract provided for redemption of the shares in various ways. It is not contended that this contract was *ultra vires* or beyond the powers of the corporation. It is conceded that it had the power under the statutes to issue preferred stock, and to contract for its redemption or repurchase. The action of the corporation and its directors therefore in redeeming this preferred stock could be no more than a breach of the preferred stock contract. It had power, through its directors, to change, alter, or modify the contract for redemption, by agreement with the preferred shareholders, or to change the contract in respect to some of the shareholders so long as the change did not invade the rights

of the remaining preferred shareholders. The action of the directors in causing the shares to be purchased was therefore not *ultra vires*. The redeemed shares bore interest at the rate of 7 per cent. per annum. At the time of the redemption the corporation may have had access to funds at a lesser rate. It may have been deemed advantageous not only to the corporation but to the remaining preferred shareholders to redeem this stock and reduce the expense of operation and thus enhance the security of the remaining shareholders. And at the time the remaining shareholders might have acquiesced in this view. It is clear that they did not wish to surrender their stock and have it redeemed. It would seem that this attitude could only be accounted for upon the theory that they believed the stock was more valuable than the money for which the corporation was required to redeem it. If this were true, all concerned profited by having the shares cancelled rather than by having the purchase price remain in the treasury. After all, the preferred shareholders are not creditors; they are stockholders. The books and records of the corporation were open to them. They have stood by these many years and acquiesced, either with knowledge or without availing themselves of the opportunity for knowledge. It would be unconscionable to permit them at this late date to claim injury and damages because of a procedure in which they at the time acquiesced and perhaps approved.

The case of *Wright, et al.* v. *Hughes, Assignee, et al.* (1889), 119 Ind. 324, 21 N. E. 907, was an action by policyholders of a life insurance company, the purpose of which was to have cancelled and held void a mortgage executed by the directors of the corporation to secure money borrowed for the purpose of purchasing its own outstanding policies in an unauthorized and un-

equal manner. It was alleged that the mortgagee, when the money was loaned, knew of the purpose for which it was to be used. It was asserted that, since the loan was for an unauthorized purpose, the action of the directors in executing the mortgage was *ultra vires*. At the time the action was begun the company was insolvent and in the hands of an assignee for the benefit of creditors. After pointing out that it was not an action in equity to enjoin the borrowing of money or the execution of the mortgage, the court said (pp. 328, 329 of 119 Ind., pp. 908, 909 of 21 N. E.) :

"The only question here is, whether the plaintiffs (and they were creditors), who in this proceeding occupy the place of the corporation, may now question the power of its directors, who were entrusted with the management of its affairs, to borrow the money and execute the bond and mortgage which they now seek to have cancelled and declared of no effect, after the corporation has received into its treasury and used the money which they were given to secure. . . .

"In the absence of any express or implied limitation upon the power of the Franklin Life Insurance Company to borrow money, it might well be held, for anything that appears in the complaint, that the board of directors, in whom was vested broad and comprehensive powers in respect to the management of the business of the corporation, did not exceed its authority in making the loan for the purpose of buying in outstanding policies, if that seemed the best method to avert financial disaster. However this may be, since there was no statute prohibiting the company from purchasing its outstanding policies, or from borrowing money for that purpose, and the transaction was not intrinsically illegal or immoral, the bond and mortgage given to secure the loan of money to be used in taking up the

policies were not void. The plaintiffs having come into a court of equity to avoid a transaction which at the most was only voidable, they must, in order to obtain any standing, offer to do equity. It is not equitable to ask a court of conscience to avoid a mortgage given to secure borrowed money without offering to return the money which has been received. Having received the full benefit of the contract, it would now be a glaring injustice to allow those representing the corporation to set it aside and retain the benefit by sustaining their contention that the loan was *ultra vires*. Especially as this doctrine only concerns the corporation in its relations with the State and with its stockholders, and is never entertained where it will injure innocent third persons."

The principles announced are applicable here.

What we have said requires that the judgment be affirmed, without further consideration of the effect of the statute of limitations and other questions discussed in the briefs.

Judgment affirmed.

NOTE.—Reported in 51 N. E. (2d) 838.