**INDIANA PORT COMMISSION,**
**Plaintiff-Appellee,**

v.

**BETHLEHEM STEEL CORPORATION,**
**Defendant-Appellant.**

**No. 82–1419.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1982.

Decided March 8, 1983.

Jerry P. Belknap, Barnes & Thornburg, Indianapolis, Ind., for defendant-appellant.

Steven M. Schneebaum, Patton, Boggs & Blow, Washington, D.C., for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

This case is the latest episode in a legal battle which has been in progress for over

eleven years. After related proceedings in Indiana state court, the Federal Maritime Commission, and the United States Court of Appeals for the District of Columbia Circuit, the complaint in this action was filed in the United States District Court for the Northern District of Indiana. This action essentially involves the collection of fees for the use of a harbor under the jurisdiction of the Indiana Port Commission ("IPC"). After receiving motions for summary judgment, the district court entered judgment for the plaintiffs and ordered the defendant to pay approximately $325,000 to the IPC. Due to the premature granting of summary judgment, we must reverse and remand the case.

## I.

The Indiana Port Commission was created by the Indiana state legislature in 1961 for the purpose of promoting "the agricultural, industrial and commercial development of the state, and to provide for the general welfare" by the construction and operation of various port facilities, including "a modern port on Lake Michigan." Ind.Code Ann. § 8–10–1–1 *et seq.* (Burns 1973). To carry out its legislative mandate, the IPC decided to construct a port and public terminal, to be known as the Burns Waterway Harbor ("the Harbor"), on Lake Michigan near Portage, Indiana. In mid-1962, the IPC, defendant-appellant Bethlehem Steel Corporation ("Bethlehem") and the Midwest Division of National Steel Corporation ("National") entered into an agreement to construct the new Harbor adjacent to parcels of land already owned by Bethlehem and National. Under the terms of the agreement, the IPC (1) purchased some land from Bethlehem; (2) granted Bethlehem riparian rights on the lake; (3) waived in perpetuity its right to condemn Bethlehem's land and (4) agreed to allow Bethlehem's vessels "access to and across the waters of the outer harbor under the same terms and conditions extended to all other vessels and under the same regulations governing all other vessels making use of Burns Waterway Harbor." *Indiana Port Commission v. Bethlehem Steel Corp.,* 534 F.Supp. 858 at

860 (N.D.Ind.1981). In exchange for this, Bethlehem agreed, *inter alia,* to construct part of the Harbor entrance, the bulkhead at the east end (the Bethlehem side) of the Harbor, the east deflector wall and riparian enclosure walls. National also agreed to build a bulkhead on its property (the west end).

In late 1969, a further agreement was reached between the IPC and the federal government providing that the federal government would reimburse the IPC for certain of its expenditures on the Harbor; that the work paid for by these funds would be carried out under the supervision of the Chief of Engineers of the Army Corps of Engineers; and, that, upon completion, the project would be accepted by the government as part of an authorized Federal Project with the maintenance and repair expenses for the portion of the project accepted by the government paid for by the government. Pursuant to this agreement, the State of Indiana granted to the federal government a deed covering the land around the outer breakwaters of the Harbor and a perpetual right-of-way easement for the use of the outer Harbor.

The IPC spent approximately $25 million on land and construction for the Harbor. This money was appropriated by the Indiana General Assembly with an express proviso that the IPC was not required to reimburse the state for the money. The United States Government, through the Army Corps of Engineers, reimbursed the IPC for approximately $13 million of these expenditures, pursuant to the 1969 agreement.

The Harbor opened in 1970. The IPC established a schedule of fees for the use of the Harbor, including a general usage fee entitled a "Harbor Service Charge" ("HSC"). The HSC was intended to defray part of the expense of administration and maintenance of the Harbor. The IPC immediately began to bill Bethlehem and National, as well as users of the public port, for HSC payable on all vessels calling at these facilities. Bethlehem and National strenuously objected to the imposition of

HSC upon the ships using their private docking facilities, arguing that the ships calling at their docks used only the federally owned portion of the Harbor and in no way used the IPC facilities. The IPC has remained unconvinced by this argument, and, since July 1971, has been engaged in litigation to collect the unpaid HSC.

The case before us was originally filed in Indiana state court in July of 1971. After the case was removed to the United States District Court for the Northern District of Indiana in late 1971, proceedings in the case were held up pending the outcome of a challenge to the HSC, which Bethlehem had initiated before the Federal Maritime Commission. After nine years of hearings before, and decisions by, Administrative Law Judges of the Commission, the Commission itself and the United States Court of Appeals for the District of Columbia Circuit, the Federal Maritime Commission dismissed the proceedings for lack of jurisdiction. Plaintiff then filed an amended complaint in the action in the Northern District of Indiana in October 1980. By the order of Chief Judge Sharp, proceedings in the case were bifurcated into a liability phase and a quantum phase. After receiving motions for summary judgment from both Bethlehem and the IPC on April 1, 1981, the district court granted IPC's motion and entered judgment for it on all liability issues on April 14, 1981. The district court, on February 24, 1982, entered a final judgment awarding $327,258.82 to the IPC, and this appeal followed.

## II.

■ As a preliminary matter, we address the issue whether federal jurisdiction was properly invoked in this case.[1] The initial inquiry in any federal lawsuit is whether the court possesses subject matter jurisdiction, and an appellate court must, if there is an apparent jurisdictional question, embark on such an inquiry *sua sponte* even where the parties fail to raise an objection of their own. *Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *Rice v. Rice Foundation,* 610 F.2d 471 (7th Cir. 1979).

The removal petition of appellant Bethlehem was based upon federal diversity jurisdiction. 28 U.S.C. § 1332(a)(1) (1976). Diversity jurisdiction requires a controversy between "citizens of different states" concerning an amount in dispute of over $10,000. The issue whether diversity jurisdiction is present turns on whether the IPC is a "citizen" of the state of Indiana for purposes of section 1332(a)(1).

■ It is well settled law that "a state is not a citizen" for diversity purposes. *Postal Telegraph Cable Co. v. Alabama,* 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1891). It is equally well established law that "a political subdivision of a state, unless it is simply 'the arm or *alter ego* of the state,' is a citizen of the state for diversity purposes." *Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973) (citation omitted). The *"alter ego"* status of a political subdivision is generally determined by examining state law. 411 U.S. at 718–20, 93 S.Ct. at 1800. Thus, diversity jurisdiction is present here only if the IPC is an entity which is separate and distinct from the state of Indiana.

■ In a taxpayer's challenge to the constitutionality of the Indiana Port Commission Act, the Supreme Court of Indiana closely scrutinized the relationship between the IPC and the state of Indiana and concluded that "the Port Commission is a public corporate entity separate from the state as a sovereign entity, . . . it is a separate corporate entity which is an instrumentality or agency of the state, although it is not the state in its sovereign corporate capacity." *Orbison v. Welsh,* 242 Ind. 385, 179 N.E.2d 727 (1962). A number of other courts, in scrutinizing the status of various Indiana agencies established by statutes similar to the IPC's, have reached the same conclusions as to the distinct and independent

---

1. While this issue was not addressed in the district court, it was raised by the court in oral argument, and supplemental briefs have been received from counsel for both sides concerning this matter.

status of these agencies. *See, e.g., Steup v. Indiana Housing Finance Authority,* 402 N.E.2d 1215 (Ind.1980) (Indiana Housing Finance Authority); *Indiana Toll Bridge Commission v. Minor,* 236 Ind. 193, 139 N.E.2d 445 (1957) (Indiana Toll Bridge Commission); *Ennis v. State Highway Commission,* 231 Ind. 311, 108 N.E.2d 687 (1952) (Indiana Toll Road Commission). The Federal District Court for the Southern District of Indiana has upheld federal diversity jurisdiction in a breach of contract action involving the Indiana Toll Road Commission, stating:

it has been held that if a state agency is a public corporation rather than an *alter ego* of the state, it is a citizen of the state which created it for purposes of diversity jurisdiction.

*Moss v. Calumet Paving Co.,* 201 F.Supp. 426, 430 (S.D.Ind.1962). *See also Indiana Port Commission v. Davis,* 8 Indiana Decisions 383 (N.D.Ind.1966) (implicitly accepting diversity jurisdiction over the IPC).

We therefore find that federal jurisdiction was properly invoked in this case. The IPC is not the *"alter ego"* of the state of Indiana, and is, in fact, an independent corporate entity seeking to assert its own rights in this action. There is a sufficient lack of identity between the IPC and the state of Indiana to render the IPC a "citizen" of Indiana within the meaning of 28 U.S.C. § 1332 (1976).

### III.

The district court decided this case on the basis of summary judgment motions made by each of the parties. Because the district court disregarded the timetable it had established for these motions and granted summary judgment prematurely, we reverse the district court's action and remand the case for further consideration.

This case involves a variety of complex legal and factual issues. At a lengthy pre-trial conference in November 1982, the district judge established a schedule for discovery and the consideration of summary judgment motions. The judge ordered that all motions for summary judgment be filed by April 1, 1981, with responses due on May 4, 1981, and oral argument on the motions

to occur after that date. The district judge stated at that conference:

I anticipate somebody and probably everybody is going to file *some* motions for summary judgment raising *some* legal issues that are having to be resolved . . . . I'm not going to set a time for reply, but I certainly will not and do not intend to foreclose the right to reply as defined by the rules.

Appellant's App. at 52a (emphasis supplied). By April 1, the parties had each filed summary judgment motions with the district court. While the IPC's motion addressed virtually all of the issues in dispute, Bethlehem chose to seek summary judgment on only one limited issue, that of whether the portions of the Harbor used by it were part of a Federal Project for which no state charge could be imposed. On April 12, the district court issued an order, deciding all issues of liability in favor of the IPC.

The IPC argues on appeal that Chief Judge Sharp had intended, by his comments, to require that *all* legal and factual issues present in the case be addressed in the summary judgment motions of the parties, and that it was thus proper to rule on those motions without the benefit of the parties' responses. We cannot accept this argument, as it transforms the district judge's comments into an absolute requirement that the parties both move for summary judgment on all issues in the case and use their main motions for summary judgment as a vehicle for responses to any arguments they anticipated their opponents would make. This would certainly be far from the procedure for summary judgment motions outlined in Rule 56 of the Federal Rules of Civil Procedure and would hardly be an efficient process for resolving complex legal and factual issues such as the ones before us. Bethlehem's cross-motion for summary judgment cannot, in any way, be considered a response to the IPC's summary judgment motion unless we rewrite the district judge's comments and agree with the IPC that "some" means "all." Because this interpretation neither comports with the apparent meaning of the district judge's pre-trial order nor makes sense as a prescription of procedure for effective re-

sponse to motions, we reject the IPC's construction.

Given our finding that Bethlehem's cross-motion for summary judgment cannot be considered a response to the IPC's motion, we must examine whether Bethlehem ever had a chance to reply to the IPC's motion before the district court entered its judgment. By his pre-trial order, the district judge extended the 10-day response time to summary judgment motions provided for in Rule 56(c) to a 33-day period. Once this period was set, the district court was obligated to adhere to its schedule under the same principles which require a district court to allow 10 days to respond to a summary judgment motion in cases where that response period has not been altered by a pre-trial order. Courts have consistently held that a district court which does not comply with the advance notice and response provisions of Rule 56(c) has no power to enter summary judgment. *See, e.g., Winbourne v. Eastern Airlines, Inc.,* 632 F.2d 219 (2d Cir.1980); *Management Investors v. United Mine Workers of America,* 610 F.2d 384 (6th Cir.1979); *Franklin v. Oklahoma City Abstract & Title Co.,* 584 F.2d 964 (10th Cir.1978); *Winfrey v. Brewer,* 570 F.2d 761 (8th Cir.1978); *Alghanim v. Boeing Co.,* 477 F.2d 143 (9th Cir.1973). The purpose of Rule 56(c) is to allow a party to have a meaningful opportunity to challenge a summary judgment motion. *Winbourne,* 632 F.2d at 223. In order best to provide that opportunity the procedural requirements of Rule 56 should be followed closely. *See Winfrey,* 570 F.2d at 764. The procedure followed by the district court in the case before us completely failed to give Bethlehem an adequate chance to respond to the IPC's motion. Bethlehem was harmed by the procedure followed, since it had no opportunity to point out the apparent factual controversies in this case which may well preclude a proper grant of summary judgment.[2] No purpose has been served by the premature truncation of the

district court's consideration of these matters.

Even if the district court *had* provided an opportunity for Bethlehem to respond to the IPC's motion, we have doubts whether this is a case where summary judgment is available. For there may well be substantial factual disputes which, despite the lengthy history of the case, are still unresolved. These appear to include, for example, the question of the "Cargill lease" and facts pertaining to the ownership of the Harbor. We therefore must decline to consider any of the intriguing legal issues presented by the merits until a district court has had the opportunity to further consider the case—either by way of prompt summary judgment (which we do not now rule out) or after procedures involving further resolution of apparent issues of fact.

We therefore reverse the grant of summary judgment and remand the case to the district court for proceedings not inconsistent with this opinion. Circuit Rule 18 shall apply on remand.

---

**2.** While we note that the "harmless error" doctrine has occasionally been employed in cases where the procedural requirements of Rule 56(c) have not been strictly complied with, *see Ikard v. Lapworth,* 435 F.2d 197 (7th Cir.1970), we find that, at a minimum, some opportunity should be given to oppose a summary judgment motion, and, in this case, clear harm to Bethlehem resulted from the total lack of such an opportunity.