**INDIANA PORT COMMISSION, Plaintiff,**

v.

**BETHLEHEM STEEL CORP.,
Defendant**

**and**

**Lake Carrier's Association,
Intervenor-Defendant.**

**Civ. No. H 71–228.**

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 23, 1987.

Steven M. Schneebaum, Jonathan N. Halpern, Patton, Boggs & Blow, Washington, D.C., Timothy P. Galvin, Jr., Galvin, Galvin & Leeney, Hammond, Ind., David C. Weigel and William Daily, Atty. Gen.'s Office, Indianapolis, Ind., for plaintiff.

Charles T. Clifford, Valparaiso, Ind., J.B. Smith, Timothy Kelly, Hammond, Ind., Jerry P. Belknap, Barnes and Thornburg, Indianapolis, Ind., Joseph O'Malley, Bethlehem, Pa., for defendant.

Thomas O. Murphy, Cleveland, Ohio, and J.B. Smith, Hammond, Ind., for intervenor-defendant.

### ORDER

MOODY, District Judge.

On Monday, December 1, 1986, a bench trial commenced in this action brought by plaintiff Indiana Port Commission against defendant Bethlehem Steel Corporation and intervenor-defendant Lake Carriers' Association. All parties were represented by counsel. Having examined the entire record and having determined the credibility of witnesses after viewing their demeanor and considering their interests, the court hereby renders the following Findings of Fact and conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### I.

#### *Findings of Fact*

This action involves the collection of fees for the use of a harbor under the jurisdiction of the Indiana Port Commission (IPC). The case has a lengthy history which is set out in the District Court opinion at 534 F.Supp. 858 (N.D.Ind.1981) and the Seventh Circuit Court of Appeals decision at 702 F.2d 107 (7th Cir.1983). The following facts, as previously revealed by the Seventh Circuit Court of Appeals, are supported by the trial evidence or by stipulation of the parties:

The Indiana Port Commission was created by the Indiana state legislature in 1961 for the purpose of promoting "the agricultural, industrial and commercial development of the state, and to provide for the general welfare" by the construction and operation of various port facilities, including "a modern port on Lake Michigan." Ind.Code Ann. § 8-10-1-1 *et seq.* (Burns, 1973). To carry out its legislative mandate, the IPC decided to construct a port and public terminal, to be known as the Burns Waterway Har-

bor ("the Harbor"), on Lake Michigan near Portage, Indiana. In mid–1962, the IPC, defendant-appellant Bethlehem Steel Corporation ("Bethlehem") and the Midwest Division of National Steel Corporation ("National") entered into an agreement to construct the new Harbor adjacent to parcels of land already owned by Bethlehem and National. Under the terms of the agreement, the IPC (1) purchased some land from Bethlehem; (2) granted Bethlehem riparian rights on the lake; (3) waived in perpetuity its right to condemn Bethlehem's land, and (4) agreed to allow Bethlehem's vessels "access to and across the waters of the outer harbor under the same terms and conditions extended to all other vessels and under the same regulations governing all other vessels making use of Burns Waterway Harbor." *Indiana Port Commission v. Bethlehem Steel Corp.*, 534 F.Supp. 858, 860 (N.D.Ind.1981). In exchange for this, Bethlehem agreed, *inter alia*, to construct part of the Harbor entrance, the bulkhead at the east end (the Bethlehem side) of the Harbor, the east deflector wall and riparian enclosure walls. National also agreed to build a bulkhead on its property (the west end).

In late 1969, a further agreement was reached between the IPC and the federal government providing that the federal government would reimburse the IPC for certain of its expenditures on the Harbor; that the work paid for by these funds would be carried out under the supervision of the Chief of Engineers of the Army Corps of Engineers; and that, upon completion, the project would be accepted by the government as part of an authorized Federal Project with the maintenance and repair expenses for the portion of the project accepted by the government paid for by the government. Pursuant to this agreement, the State of Indiana granted to the federal government a deed covering the land around the outer breakwaters of the Harbor and a perpetual right-of-way easement for the use of the outer Harbor.

The IPC spent approximately $25 million on land and construction for the Harbor. This money was appropriated by the Indiana General Assembly with an express proviso that the IPC was not required to reimburse the state for the money. The United States Government, through the Army Corps of Engineers, reimbursed the IPC for approximately $13 million of these expenditures, pursuant to the 1969 agreement.

The Harbor opened in 1970. The IPC established a schedule of fees for the use of the Harbor, including a general usage fee entitled a "Harbor Service Charge" ("HSC"). The HSC was intended to defray part of the expense of administration and maintenance of the Harbor. The IPC immediately began to bill Bethlehem and National, as well as users of the public port, the HSC payable on all vessels calling at these facilities. Bethlehem and National strenuously objected to the imposition of HSC upon the ships using their private docking facilities, arguing that the ships calling at their docks used only the federally owned portion of the Harbor and in no way used the IPC facilities. The IPC has remained unconvinced by this argument, and, since July 1971, has been engaged in litigation to collect the unpaid HSC.

The case before us was originally filed in Indiana state court in July of 1971. After the case was removed to the United States District Court for the Northern District of Indiana in late 1971, proceedings in the case were held up pending the outcome of a challenge to the HSC, which Bethlehem had initiated before the Federal Maritime Commission. After nine years of hearings before, and decisions by Administrative Law Judges of the Commission, the Commission itself and the United States Court of Appeals for the District of Columbia Circuit, the Federal Maritime Commission dismissed the proceedings for lack of jurisdiction. Plaintiff then filed an amended complaint in the action in the Northern District of Indiana in October 1980. By the order of Chief Judge Sharp, proceedings in the

case were bifurcated into a liability phase and a quantum phase. After receiving motions for summary judgment from both Bethlehem and the IPC on April 1, 1981, the district court granted IPC's motion and entered judgment for it on all liability issues on April 14, 1981. The district court, on February 24, 1982, entered a final judgment awarding $327,258.82 to the IPC. 702 F.2d at 108–109. On appeal, the grant of summary judgment was reversed on the grounds that Bethlehem Steel had not been given a meaningful opportunity to challenge the IPC's summary judgment motion. 702 F.2d at 111.

As a defense to the IPC's action for debt collection, the defendants request the court to find that the Harbor Service Charge (HSC) is invalid on the grounds that the HSC (1) violates the prohibition against duties of tonnage, U.S. Const. Art. I, § 10, cl. 3; (2) violates the terms of the Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5, and the River and Harbor Act of 1902, 33 U.S.C. § 565; (3) violates the terms of a 1962 agreement between Bethlehem and IPC because at least one user of the public port (Cargill, Inc.) is afforded access to the Harbor on terms preferable to Bethlehem's; (4) impermissibly charges Bethlehem fees for vessels neither owned nor operated by Bethlehem; and (5) violates a condition of the federal funding in which the State of Indiana agreed not to charge vessels for the privilege of entering the Harbor.

*Duty of Tonnage*

In 1962 when IPC, Bethlehem Steel, and the Midwest Division of National Steel agreed to construct the Harbor adjacent to parcels of land already owned by Bethlehem and National, it was not known whether the federal government would reimburse the IPC for any of its expenditures. As stated above, Bethlehem constructed part of the Harbor entrance, the bulkhead at the east end (the Bethlehem side) of the Harbor, the east deflector well, and riparian enclosure walls. National constructed a bulkhead on its property (the west end). The IPC used state-appropriated funds (a) to dredge the outer harbor, including the entrance channel; (b) to construct the outer breakwaters; and (c) to construct the public terminal facility. The IPC also contributed the land under the outer Harbor itself and under the breakwaters and committed a 20–acre site for future dredge spoils disposal. The United States reimbursed the IPC for the expenses of (a) dredging the outer Harbor, the entrance channel, and the east and west harbor areas, excluding the berthing areas; and (b) constructing the outer breakwaters. The United States accepted the outer Harbor, the east and west harbor arms and the outer breakwaters as part of an authorized federal project and assumed the expense of maintaining and repairing these portions of the Harbor.

In 1970, the Burns Harbor Waterway opened and the IPC began charging the HSC, at a rate of one cent per gross registered ton, on all "commercial vessels entering the physical limit" of the Harbor regardless of whether the vessel used the IPC's public terminal facility. The following categories of vessels were exempt from the HSC except that the IPC reserved the right to charge them for services actually rendered: vessels which enter the Harbor solely to refuel, resupply or change pilots and remain for less than 24 hours; vessels which neither receive nor discharge cargo and remain for less than twelve hours; government vessels not carrying cargo, troops, or supplies; and vessels using the Harbor as a harbor of refuge.

The IPC does not provide pilotage services for vessels entering the Harbor. Nor does the IPC provide Bethlehem, or other ships entering the Harbor, with accommodations for wharfing or for handling or stowing goods. The IPC does not supervise shipping, provide services to prevent collisions and fires, police the Harbor, or aid in extinguishing fires in vessels in the Harbor.

IPC claims that some of its expenses in constructing and dredging the Harbor benefitted all users of the Harbor and asserts that the HSC is imposed to recoup these

expenditures. The IPC's unreimbursed expenses include a portion of the funds for constructing an access road to the Harbor during construction and dredging and constructing a rubble mound retaining wall to protect the Harbor from erosion of the riparian fill area of the public port site. IPC purports to recoup these expenses by imposing the HSC. However, Bethlehem has borne comparable unreimbursed expenses in constructing its own dock wall and dredging the adjacent berthing area. These unreimbursed expenditures only incidentally benefit all users of the port but primarily serve to benefit the users of the respective docks. The IPC is in a position to impose the HSC only by virtue of its sovereignty and not because of any claimed right of proprietorship in facilities such as wharves or locks. The IPC's expenditure which only incidentally benefits users of the Harbor, cannot be accurately characterized as assistance rendered or facilities furnished by the State to vessels using the Harbor.

The federal government, and not the IPC, owns the outer breakwater walls and the land beneath them. In addition the federal government holds a perpetual right-of-way easement over the lands beneath the outer Harbor, the entrance channel, and the east and west Harbor arms, excluding the berthing areas. The federal government has the corresponding responsibilities for maintenance, repairs, and supervision of the Harbor. The Harbor, as distinct from IPC's public terminal facility, was constructed at an expense that was principally borne by the federal government.

*Federal Statutory Proscriptions*

In exchange for the United States reimbursing the State of Indiana for part of the cost for the Harbor and public terminal construction, the State of Indiana and the federal government agreed that the work paid for by these funds would be carried out under the supervision of the Army Corps of Engineers and that the federal government would accept that part of the project as part of an authorized federal project and would pay maintenance and repair expenses for the portion of the project it accepted and funded. Pursuant to the agreement, the federal government received a deed for fee simple title to the land around the outer breakwaters and a perpetual right-of-way easement for the use of the outer Harbor.

The United States reimbursed the State of Indiana for nearly all of the costs of the Harbor, as distinguished from the public terminal facility for which the State of Indiana absorbed the cost. Although the State of Indiana retained the bare legal title to the bed underlying the Harbor, the real and beneficial uses of the Harbor belong to the federal government which has the fee simple deed to the land around the outer breakwaters, perpetual right-of-way easement for the use of the outer Harbor, and responsibility for regulation and supervision of the Harbor. In this sense, the navigational improvement, although not the bed underlying it, "belongs to" the United States.

The Reimbursement Agreement for Harbor Construction and Dredging between the United States Government and the State of Indiana provides that the United States would reimburse the State for the total cost of constructing the West Outer Bulkhead, the North Breakwater and the total cost of dredging the West Harbor Arm, the East Harbor Arm, the Outer Harbor, and the Entrance channel excluding berthing areas and facilities to retain dredged material in the disposal area. Although the State agreed to complete the Harbor project, it agreed that the federal government would fund the project, and the State agreed to complete the Harbor under the supervision of the U.S. Army Corps of Engineers' Chief of Engineers.

*Cargill Lease*

In the 1962 Harbor construction agreement between the IPC and Bethlehem, the IPC agreed, *inter alia*, to allow Bethlehem's vessels "access to and across the waters of the outer harbor under the same terms and conditions extended to all other vessels making use of Burns Waterway

Harbor." Bethlehem agreed in exchange to construct some of the Harbor improvements. As a defense to the imposition of the HSC, Bethlehem asserts that the IPC is violating its Harbor construction agreement by allowing Cargill, Inc., to enter the Harbor on more favorable terms than it allows Bethlehem entry.

Cargill leases public terminal space and, pursuant to a contract with the IPC, agreed to pay a minimum of $268,000 annually, $100,000 of which represented property rental and $168,000 of which represented dockage, harbor service, and wharfage charges. These service charges were calculated based on an estimate of Cargill's usage.

The Cargill lease also contained a provision by which Cargill paid a portion of this $268,000 directly to a creditor of IPC and reduced its payments to the IPC by a like amount. In effect, the IPC assigned to its creditor the IPC's right to receive payment from Cargill. Cargill's total payment under the lease, including these direct payments to IPC's creditor, never falls below $268,000. This amount, under any form of payment, would have covered the full HSC and other service charges owed by Cargill.

*HSC on Vessels Not Owned by Bethlehem*

The tariff imposing the HSC specifies that "[e]very vessel by its master or agent shall pay" the HSC on presentation of an invoice. The IPC has interpreted this tariff to allow it to collect the HSC from Bethlehem for all vessels calling at Bethlehem's port, regardless of whether Bethlehem owns the vessel. Bethlehem disclaims HSC liability for vessels that it neither owns nor operates.

█ The vessels calling at Bethlehem's dock are common carrier barges owned and operated by independent barge line operators hauling products for Bethlehem.[1] These common carriers owe no fiduciary duty to Bethlehem. Nor does Bethlehem have the right to control the details, man-

ner, or particular method of performing the delivery and hauling tasks.

*Conditions on Federal Funding of the Harbor*

Bethlehem asserts that the State of Indiana agreed, as a condition of federal funding, not to charge vessels for the privilege of entering the Harbor. This argument is essentially the estoppel defense which the court has previously disallowed because it was not timely raised in this case. *See* Court Order dated September 26, 1983. The court refused to allow Bethlehem to amend its complaint to add the defense that [b]y reason of the acts of Congress in reliance on such representations (that the State would not charge for mere entry into the Harbor), plaintiff is now estopped from seeking to impose on vessels entering the Harbor a harbor service charge for the use of the Harbor.

## II.

### CONCLUSIONS OF LAW

Because IPC is a citizen of Indiana and Bethlehem Steel is a citizen of Delaware and Pennsylvania and the amount in controversy exceeds $10,000, this court may properly retain federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

*Duty of Tonnage*

█ The United States Constitution provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage." Article I, § 10, cl. 3. Tonnage duties are taxes or tolls measured by tonnage and imposed on vessels that are instruments of commerce. *Cox v. Lott,* 79 U.S. (12 Wall.) 204, 20 L.Ed. 370 (1871). Thus, the prohibition against a duty of tonnage forbids "all taxes and duties regardless of their manner or form, and even though not measured by the tonnage of the vessels which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines v.*

---

1. Although the plaintiffs on November 26, 1986 filed a memorandum objecting to the admission of Exhibits M–1 and M–2, they raised no objec-

tion to the admission of these exhibits at trial. Transcript, p. 84. Therefore, any objection was waived.

*Alabama,* 296 U.S. 261, 265–66, 56 S.Ct. 194, 195–96, 80 L.Ed. 215 (1935); *Huse v. Glover,* 119 U.S. 543, 549, 7 S.Ct. 313, 316, 30 L.Ed. 487 (1886). The U.S. Supreme Court distinguishes tonnage duties from other fees charged by state authorities "for services rendered to and enjoyed by the vessel," such as pilotage, wharfage, charges for the use of locks on a navigable river, or fees for medical inspection. *Clyde Mallory Lines,* 296 U.S. at 266, 56 S.Ct. at 196 (1935). The latter charges for services rendered by the state are "neither within the historic meaning of the phrase 'duty of tonnage' nor the purpose of the constitutional prohibition" even if such charges are graduated according to tonnage. *Clyde Mallory Lines,* 296 U.S. at 267, 56 S.Ct. at 196.

■ To determine whether a charge is a duty of tonnage within the meaning of the Constitution, one must consider the essence and the object of the charge. If the essence of the charge is a duty for the privilege of entering the port imposed by authority of the State, it is a constitutionally prohibited duty of tonnage. If it is a charge for services rendered or conveniences provided, it is not a duty of tonnage. *Packet Co. v. Keokuk,* 95 U.S. (5 Otto) 80, 84–85, 24 L.Ed. 377 (1877).

■ The HSC imposed on all vehicles entering the Harbor is a duty of tonnage and is therefore prohibited by Article I, § 10, cl. 3 of the United States Constitution. It is not a charge for services rendered or convenience provided by the State. The State of Indiana, through the IPC, may charge vessels for wharfing at the public terminal or for other services it provides but may not charge for merely entering, trading in, or lying in the Harbor, which is operated and was improved, for all practical purposes, by the federal government. Although this court's conclusion that the HSC is a constitutionally proscribed duty of tonnage disposes of the case, the court will address the remaining issues to provide a more complete record.

*Federal Statutory Proscriptions*

The Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5, provides that

No tolls or operating charges whatever shall be levied upon or collected from any vessel, dredge, or other water craft for passing through any lock, canal, canalized river, or other work for the use and benefit of navigation, now belonging to the United States or that may be hereafter acquired or constructed.

Although it has previously been held in this case that this statutory proscription "was not addressing the power of the States" to levy tolls, 534 F.Supp. at 867, the plain wording of § 5 prohibits all tolls or operating charges for passing through any work for the use and benefit of navigation which belongs to the United States. Where the meaning of terms in a statute are unambiguous, the statutory analysis begins and ends with the language of the statute itself unless there is persuasive reason to the contrary. *Graczyk v. United Steelworkers of America,* 763 F.2d 256 (7th Cir.1985); *International Administrators, Inc. v. Life Insurance Company of North America,* 753 F.2d 1373 (7th Cir. 1985). Therefore, if the Burns Waterway Harbor is a "work for the use and benefit of navigation" and belongs to the United States, then no tolls or operating charges may be levied for its use, regardless of which entity is attempting to levy the charge. The Harbor is a work for the use and benefit of navigation. Thus whether 33 U.S.C. § 5 prohibits tolls or operating charges depends on whether the Harbor "belongs to" the United States.[2]

■ In *Huse v. Glover,* the federal government paid a small portion of the expense of constructing locks and dams, the principal expenses being borne by the State of Illinois. The court did not mention

---

**2.** The defendants have offered into evidence an interrogatory which asks a U.S. Army Corps of Engineers representative whether the Burns Harbor Waterway is a federal harbor. The plaintiff's objection to this evidence is sustained inasmuch as this interrogatory played no part in the court's decision.

the applicability of 33 U.S.C. § 5 and hence, implicitly found either that the statute imposed no restriciton on the right of states to levy tolls or that the federal government's minor contribution of funds did not cause the navigational improvement to "belong to" the United States under 33 U.S.C. § 5. Unlike the *Huse v. Glover* case, the federal government in the case at bar contributed more than a "small portion" to the construction of the Harbor. The state of Indiana agreed that the Burns Waterway Harbor Project would become an authorized federal project when the federal government accepted the work as complete. This agreement and the federal government's right of the real and beneficial uses of the Harbor demonstrate the parties' intent to make the Burns Waterway Harbor, but not the public terminal and transfer facilities, a project "belonging to" the United States.

■ Title 33 U.S.C. § 565 provides for private and municipal improvements on "any" navigable river, or any part thereof. The text of § 565 does not by its terms, apply to improvements on lakeshores and the defendants have offered no compelling authority to justify such an extension of the plain meaning of § 565. Because the improvement in question in the present case was made to part of Lake Michigan and because Lake Michigan is not a "navigable river," § 565 does not apply in this case.

### Cargill Lease

The burden of proving breach of contract is on the party asserting the breach. *Orto v. Jackson*, 413 N.E.2d 273, 277 (Ind.App. 1980); *Daniels v. Indiana Trust Co.*, 222 Ind. 36, 51 N.E.2d 838 (1944). Bethlehem has failed to demonstrate that Cargill was allowed to use the outer Harbor on terms and conditions more favorable than those extended to Bethlehem even presuming that Bethlehem was making full payment of the HSC. Therefore, Bethlehem has failed to show that the IPC breached its 1962 construction agreement with Bethlehem by allowing other vessels to enter the Harbor on more favorable terms and conditions than extended to Bethlehem.

### HSC on Vessel's Not Owned by Bethlehem

■ The common carriers which deliver and haul products for Bethlehem are not "agents" of Bethlehem. Because Bethlehem lacks the power to control the details of the common carriers' work, there is no principal-agency relationship between Bethlehem and these common carriers. *Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1247–48 (Ind.App.1984). Therefore, the tariff does not authorize the IPC to collect the HSC from vessels calling at Bethlehem's dock which are neither owned nor operated under the control of Bethlehem.

### Conditions on Federal Funding

Bethlehem's assertion that Congress conditioned the federal funding of the Harbor on the State's agreement not to charge for entry into the Harbor is essentially the same estoppel argument this court has previously refused to permit Bethlehem to assert as a defense. Therefore, the defense and the trial evidence related to it will not be allowed. The plaintiff's objection to Exhibit L, which purports to be a transcript of testimony before Congressional committees, is sustained on the grounds that it is not relevant to material issues in this case.

### CONCLUSION

The Harbor Service Charge imposed by the Indiana Port Commission is invalid as violative of the constitutional prohibition on duties of tonnage. Even assuming the HSC was not a constitutionally-proscribed duty of tonnage, the HSC violates the Rivers & Harbors Appropriation Act of 1884 which prohibits the collection of tolls or operating charges from vessels passing through navigational works belonging to the United States. 33 U.S.C. § 5. Title 33 U.S.C. § 565 is no bar to the HSC. The HSC is not invalid on the basis of any difference between Cargill Inc.'s access terms and Bethlehem's access terms. The tariff which authorizes the IPC to collect the HSC from "agents and owners" of

vessels entering the Harbor does not authorize the IPC to collect from Bethlehem the HSC for vessels neither owned nor operated by Bethlehem. Bethlehem will not be permitted to raise a disguised estoppel defense because the court has previously refused to allow Bethlehem to amend its answer to include such a defense.

### ORDER

Because the court has found that IPC's imposition of the HSC for vessel's mere entry into the Burns Waterway Harbor is unconstitutional, it is hereby ADJUDGED that the plaintiff take nothing by its complaint. The Clerk of the Court is directed to ENTER JUDGMENT in favor of the defendants.